```
 1          IN THE UNITED STATES DISTRICT COURT FOR

 2              THE NORTHERN DISTRICT OF FLORIDA

 3                    PENSACOLA DIVISION

 4    _____

 5    WAYNE FABOZZI and

 6    WENDY FABOZZI,

 7           Plaintiffs,

 8       v.                          Case No.:

 9    UNITED STATES OF AMERICA,        3:23-CV-10474-TKW-HTC

10           Defendant.

11    _____

12              VIDEOTAPED 30(b)(6) DEPOSITION

13    _____

14

15    WITNESS:          COLONEL VINCENT JOHN CHIOMA

16    DATE:             Tuesday, December 5, 2023

17    START TIME:       10:22 a.m., ET

18    END TIME:          3:13 p.m., ET

19    REMOTE LOCATION:   Remote Legal platform

20    REPORTER:          Skyler Daniels, CER 1973

21    JOB NO.:           21434

22

23

24

25
```

1        A    I do.

2        Q    Would you read topics 6 and 7 to yourself?

3        A    Okay.  Stand by.  (Reads to self).  Okay.

4    I've read them both.

5        Q    Okay.  Colonel, do you understand that you are

6    designated to testify about topics 2, 3, 6, and 7 on

7    Exhibit 1?

8        A    I do.

9        Q    What is your understanding of your

10   responsibility concerning those topics that you've been

11   designated to testify about today?

12       A    I understand my -- my responsibility is to

13   answer questions to the best of my ability, as I

14   understand them, within those four areas.

15       Q    Okay.  With regard to topics 2, 3, 6, and 7 on

16   Exhibit 1, you understand that you're designated on

17   behalf of the United States of America, not just the --

18   not just the United States Air Force, right?

19       A    I understand.

20       Q    Are you fully prepared to discuss the topics

21   you've been designated for?

22       A    My only reservation on that is there's some

23   terms in there that are not familiar to me.

24       Q    Okay.  Well, what terms are you not familiar

25   with?

1    trajectories for a shot that's being fired, like, from a

2    mortar or a machine gun or some other type of rifled

3    round.  So just think of a projectile flying through the

4    air.  All of those contain a predictable kinematically

5    bounded area in which we can say, if you're outside of

6    this area, you are safe from the particular predicted

7    failure mode of that particular -- of that particular

8    activity.

9            In this case, for the naval school, the

10   predicted activity which we have -- that is of interest

11   is the ring -- range ring effectively surrounding the

12   location of the detonation, which we refer to as a blow-

13   hole.  That's actually several thousand feet, I believe,

14   in this case.  So that area would encompass the area

15   which is -- we predict, is hazarded -- hazarded due to

16   the particular operation detonation that's going on in

17   that case.  There obviously are other operations going

18   on, other locations of the range.  There's aircraft

19   flying overhead.  There might be bombs and missiles

20   flying overhead.  But those -- when we say a safe area,

21   what we're referring to is the area that's outside of

22   the predicted danger zone, if you will, for the

23   particular operation that's ongoing.

24      Q    So if I can repeat your answer back to you,

25   make sure I understand it.  You tell me whether I

1    understand it.  Okay?

2         A    Okay.  Go ahead.

3         Q    So the safe area, as you referred to it, is a

4    -- the area outside a predictable bounded area where you

5    can -- where you expect to be safe from predicted

6    failure mode of the activity that you're doing.

7                   MR. FISHER:  Object to form.

8                   Go ahead.

9                   THE WITNESS:  Can I continue?

10                  MR. FISHER:  Yes.

11                  THE WITNESS:  Okay.  I think that's

12   actually a pretty good, probably a much more succinct

13   description.

14   BY MR. JACOB:

15        Q    In order for that definition to work, you have

16   to sort of predict the, I guess, area of danger that a

17   particular activity can cause, right?

18        A    When we generate -- what we call a safety

19   profile that is based on what we know about the weapon

20   or the item that's potentially exposing someone to risk.

21   We tend to use conservative assumptions because there's

22   a lot of information we just don't have available to us

23   as engineers when we try to do this engineering

24   analysis.

25                  Again, it is specific to a specific weapon, a

1    typically, have different limitations.

2            These limits are not just specific to the

3    area, though.  They're actually specific to a -- to a

4    training directive or particular operation.  So we may

5    adjust a particular operation to be even more

6    conservative.  Or in some cases, we may accept

7    additional risk for a particular operation and then

8    provide other mitigations against that risk that are not

9    required for all the operations that occur at that

10   range, but where the significance of this particular

11   mission might warrant the additional resources that come

12   with additional mitigations, as an example.

13       Q    And are you familiar with the term tamping?

14       A    I am familiar with that term.  And the -- let

15   me tell you what I think it -- what I think you're

16   getting at, and you tell me if you think I'm right.

17   Tamping is a term that EOD uses.  It effectively means

18   burying the -- burying the charge or having a charge

19   which is somehow underground.

20       Q    And you said you're -- you wanted to tell me

21   what you thought I was getting at.

22       A    No.  I'm asking is that --

23       Q    Yeah.

24       A    -- in the EOD community, we use the term

25   tamping to describe putting a -- an item that we intend

1    to explode underground.  Is that -- is that the

2    connotation you mean?

3        Q    Yeah.  And what I'm getting at is, you know,

4    the -- you know, this range, in particular, and other

5    ranges have specific limits on the amount of net

6    explosive weight that can be used in a training

7    exercise, as well as requirements to tamp that

8    explosive, correct?

9        A    We have in the past have requirements I'm not

10   a -- off the top of my head, I can't tell you of any

11   range right now where I have an existing requirement for

12   tamping of an explosives.  We tend to get away from that

13   because tamping is -- is not a good way, in my opinion,

14   of exposing -- of disposing of EOD.  I think most

15   members of the EOD community would agree with me.  They

16   don't like to do that if they can avoid it.

17       Q    And I guess what I'm getting at is going back

18   to our discussion about predicting the area of where --

19   of danger that could occur on -- in an exercise.  That

20   prediction can go wrong if you're exceeding the net

21   explosive weight or not following regulations concerning

22   how you should be exploding these devices; is that

23   correct?

24       A    Yeah.

25                 MR. FISHER:  I'm just going to quickly

1    question.

2                    You can go ahead.

3                    THE WITNESS:  Yeah.  So you said the

4    areas that the Navy School clears of UXOs.  I'm not --

5    the Navy School doesn't do the -- they're not part of

6    our range clearance process for UXOs.

7                    MR. JACOB:  Okay.

8                    THE WITNESS:  So can you rephrase the

9    question?

10                   MR. JACOB:  Yeah.  Let me -- let me go

11   back.

12   BY MR. JACOB:

13       A    So you know, the -- there are requirements to

14   clear these ranges, correct?

15       A    Correct.

16       Q    And are the requirements to clear the ranges

17   based on the safety profiles that are generated based on

18   the activities that occur on a range?

19       A    They're based, in part, on the activities that

20   occur in the range.  They -- it would be difficult to

21   say a particular clearance operation on -- related to

22   the EOD school routine detonations.  It would be

23   difficult to say there's a specific range clearance

24   activity where we cleared the range, and that was

25   because of an incident on this date or because of a

1    Q    Okay.  And it says on this Exhibit 3, Boundary

2    of Dedicated Impact Area (dashed line).  Can you explain

3    what that means?

4    A    Yes.  So we treat part of Charlie 52 North as

5    a dedicated impact area.  Again, that's terminology that

6    may not be defined in any Air Force document.  But it's

7    in the -- it's described in the Army pamphlet and the

8    EOD community uses it.  The -- the explosives community

9    uses that term.

10         In this case, it refers to an area where we do

11   not allow people to go unless they are under escort by

12   EOD personnel.  It's about 300 feet from Range Road 200.

13   The area between that demarcation and 200 is part of the

14   area that's mowed.  There are some areas north of 200

15   that are also routinely mowed and used for targets and

16   other operations.  The area south of the -- what's shown

17   as a dashed line on this map is not mowed.  That's the

18   area where it's -- we treat it as a dedicated impact

19   area and requires by policy, EOD escort to go into that

20   area.  Again, we would assume if you're in that area

21   there's just badness in that area.  You don't -- you

22   don't want to go there.

23   Q    Okay.  So if I can break down your answer and

24   make sure I'm understanding it correctly.  On Exhibit 3

25   we have a dashed line that is labeled boundary of

1    dedicated impact area, correct?

2        A    That's correct.

3        Q    And is it fair to say the area south of that

4    dashed line is the dedicated impact area?

5        A    The area south of that dashed line and within

6    Charlie 52 North we treat as a dedicated impact area.

7    Again, dedicated impact area is not a -- I'm not sure

8    that it's an Air Force official term, but we use that

9    term to describe the area, "thou shalt not go south of

10   this line" unless you have an EOD escort watching every

11   step that you make telling you where to step.

12       Q    Okay.  And that dedicated impact area boundary

13   is about 300 feet or yards south of Range Road 200?

14       A    I believe it's between -- it's more than -- I

15   believe it's between 300 and 400 feet.  I think in

16   sections it may be as much as 400 feet.  So it's -- it's

17   -- it's -- I don't think it's 300 yards.  I think it's

18   300 to 400 feet.

19       Q    Okay.  So let me rephrase that question so

20   it's -- the record is clear.  The boundary of the

21   dedicated impact area in Exhibit 3 is 300 to 400 feet

22   south of Range Road 200?

23       A    I believe that's correct.  I actually could go

24   into a -- one of our applications electronically if I

25   had my system with me and actually pick two points and

1    tell you what exactly the distance is.  I feel

2    comfortable today going on record saying I think it's 3-

3    or 400 feet.

4        Q    Okay.  And then the area north of the boundary

5    of the dedicated impact area on Exhibit 3, that's the

6    area where you would expect people to be?

7        A    That's correct.  That's an area where the --

8    there's still -- there's still a control of people who

9    go in there.  Only certain people are allowed in that --

10   in that area for obvious reasons.  But it is not as

11   tightly controlled as the area that we treat as a DDI,

12   as a dedicated impact area, and therefore does not

13   require EOD escort.

14       Q    The area north of the boundary for the

15   dedicated impact area, is that area mowed?

16       A    The area that was in yellow, that was north of

17   the dashed line, those areas are mowed with the

18   exception of the red box.  I don't think they mow right

19   on top of the OCB.  The OCB is a -- is -- is an earthen

20   berm, that is over top of a structure.  And I -- I don't

21   imagine they would -- I don't imagine you would take a

22   lawnmower up on top of that.  So that's -- that's the

23   area that's marked off as we don't mow here.  But other

24   than that, the areas within the yellow, I believe, match

25   close to exactly with the areas that -- that are

1    annually bush hogged.

2        Q    Is the area north of the dashed line on

3    Exhibit 3, is that cleared on a regular basis of UXOs?

4        A    Yes.

5        Q    And how often is it -- is it, or should it be

6    cleared?

7        A    It's cleared quarterly.

8        Q    Okay.  And what is the -- how far north of the

9    boundary of the dedicated impact line does the

10   Government clear quarterly of UXOs?

11       A    I -- I might have misunderstood the previous

12   question.  The -- I don't have a picture of it in front

13   of me, but I can probably -- excuse me a second.

14   (Coughs) sorry.  The -- I think I have a picture that

15   actually shows the specific areas that are cleared

16   during the quarterly cleanups.  Would you like me to

17   show you that?

18       Q    Hold On.  Okay.  So let's step back one

19   second.  The -- we're talking about, on Exhibit 3, this

20   dashed line, correct?

21       A    Yes.

22       Q    And that's the boundary of the dedicated

23   impact area, right?

24       A    Correct.

25       Q    And now, south of that line is where people

1    by the question.  The why is causal.  But you're asking

2    why to something that didn't happen?  What was -- what

3    caused something that did not happen?  I can tell you

4    why areas are cleared.

5         Q    Okay.  Well, let's step back then.  What areas

6    north of the boundary of the dedicated impact line are

7    required to be cleared?

8         A    So we're required to clear annually the road

9    and the blowhole.  We're required to clear as necessary

10   other areas.  For instance, if we were to use them for

11   other operations, for example -- an example of that

12   would be the 7th Special Forces Group might come in

13   there and do operations, which I think they routinely

14   do.  We might clear that area for -- before they do

15   operations.  We also -- part of the process of bush

16   hogging is part of the range clearance process.  Again,

17   it's not specific to UXOs, it's just one of these steps

18   of the range clearance process.

19              So when you say range clearance, there's lots

20   of areas where we do range clearance.  When you refer

21   specifically to UXOs, that's just a piece of the range

22   clearance process.  And so the boundaries for those

23   might be different.  In this case, they are different.

24        Q    Okay.  And let's just talk about the clearance

25   of any explosive material north of the boundary for the

1    dedicated impact area.  What is required to -- what

2    areas are required to be cleared of explosive material?

3        A    The -- actually the blowhole is south, so

4    that's not part of it.  (Coughs) excuse me.  So Range

5    Road 200, a portion of it up to, I think, about where

6    the OCB is, is required to be cleared quarterly.  And so

7    when I look to the DoDIs, et cetera, and I say, are we

8    following the procedures -- excuse me.  I'm not used to

9    talking this much.  I'm usually more of a listener.

10   (Coughs) excuse me.

11          When we say are we clearing the areas in

12   accordance with the DoDI?  Yes.  We are following that

13   for the areas designated, which we designate as Range

14   Road 200.  We clear that annually.  There is also other

15   operations which you could refer to as UXO clearance.

16   That's done after mission by the EOD folks.  They do it

17   at the blowhole.  They also do it at the -- across Range

18   Road 200.  That's mostly -- they -- they obviously would

19   flag any UXO that they see.

20          But for the most part, they're doing that for

21   the purposes of avoiding flat tires and such.  Because

22   if you get shrapnel there, you're going to have a flat

23   tire.  And you don't want a flat tire out in the middle

24   of there.  Then the third portion of range clearance

25   that we do in that area on a routine basis is the annual

1    bush hogging.

2        Q    Okay.  Is the -- but you said that the annual

3    bush hogging is not done for this purpose of clearing

4    explosive material?

5        A    That's correct.  It's part of the range

6    clearance process, but not specifically looking for

7    UXOs.  And I would -- would -- if you're out there with

8    a lawnmower, you hope you don't find a UXO.  I'm not

9    aware of any instances where a UXO was found by somebody

10   mowing.  In fact, mowing, to my knowledge, the only UXO

11   that was found in this area, if it was found in this

12   area, was the one that Mr. Fabozzi brought in.

13       Q    So going back.  But you do clear the Range

14   Road 200 up to the operational control bunker for

15   explosive material, you said?

16       A    Yes, sir.  And we may do west of that as well.

17   I can't recall off the top of my head whether we do --

18   how far west of the OCB we go.  There may be another

19   boundary farther west of there, another gate, for

20   example.  And they -- they don't stop at the OCB.  They

21   go all the way to that gate.  I'm not sure.  But I do

22   know that, at least, the part at the OCB and east of the

23   -- sorry -- at the OCB and west of the OCB, I know they

24   clear that.

25       Q    Now, when you're talking about clearance of

1    explosive materials on Range Road, is it just the road,

2    or are you clearing, you know, a buffer zone beyond just

3    the road itself, the asphalt itself?

4         A    I believe the limit that they're clearing is

5    about 50 feet.  It's -- it's visual.  I'm not certain of

6    that.

7         Q    Okay.  All right.  Let me close this for the

8    time being.  And let's go back to the doc.  We're still

9    on the documents.  You brought a lot of documents with

10   us.  We covered the four pictures that you brought.  Are

11   there any other documents in your binder?

12        A    There are two left.

13        Q    Okay.  And what are those two?

14        A    Okay.  The next document is a document that I

15   prepared.  It is 21 pages.  It is not CUI, it is not

16   FOUO.  It's not proprietary.  And I prepared it for --

17   in -- in preparation for this deposition, as we were

18   discussing who was going to do it, and then in

19   preparation for the deposition.  It contains material

20   from previous -- primarily from previous documents that

21   we've already gone through.

22             And I attempted to consolidate the portions

23   that I thought might be relevant to this discussion.

24   And as I said previously, at least, some of them I knew

25   had changed before and after the incident.  And so I

1    they were setting up, they would have said it's safe

2    from the standpoint of the predicted malfunctions or

3    incidents that could happen from this detonation do not

4    include this area.

5         Q    To be fair, that's not what they said, though,

6    is it?

7         A    I'm -- I'm telling you what I think they refer

8    to.  I'm telling you what the community refers to when

9    we say the word safe area, which, again, as a safety

10   person, we don't use that term.  Safe area, typically,

11   means the area that's outside of the danger zone for the

12   particular activity that's going on.

13            In this case, the particular activity that was

14   going on was a detonation over at the blowhole that --

15   the term safe area certainly does not assume that you're

16   -- or does not imply that you're safe from other

17   activities that are going on on the range.  You're not

18   safe, obviously, from UXOs.  You're not safe from the

19   wildlife.  There's dangerous area -- things out there.

20   You're also not safe to other apparitions that are going

21   on.  To include bombs that are flying on live aircraft

22   overhead.  Those are all part of the -- what makes being

23   on a bomb range an inherently dangerous place to be and

24   part of the reason why we do require the enhanced

25   training if you're going to be in an area such as

1    I understand he actually had been on the range quite a

2    few years, and I expect that he had been exposed to that

3    training multiple times.

4            I've seen one log where he was -- where he

5    logged in as having received the training or he recorded

6    with his own -- his own signature that he received the

7    training.  I don't recall when that was.  I also know

8    that his company described that he had also received the

9    training as required by the company.  I don't know what

10   the date of that was either.

11       Q    Okay.  So going back to my question, are you

12   aware of any training between 2018 and 2021 related to

13   the explosives on this range that Mr. Fabozzi received?

14       A    I would not expect to be aware of that, and I

15   am not aware of it.

16       Q    Okay.  The area surrounding the OCB, the

17   operational control bunker on Range 52, that's an area

18   where the naval school trains school attendees on

19   explosives, correct?

20       A    I believe that's an area where we designate

21   people who are not involved with the blow-hole operation

22   to muster, to stay, so that the instructors who are over

23   at the blowhole are not necessarily watching them.

24   They're not under the control of the instructors that

25   are over at EOD.  So for instance, in this case, there's

1    must be cleared?

2         A    The 96th Test Wing works with our tenant units

3    and comes up with areas that are required to be cleared

4    based on the -- we do that based on what operations have

5    occurred, what operations will occur, and of course, in

6    consonance with the -- the DoD and the AFI, the Air

7    Force instructions, the DoD instructions and US law.  So

8    we look at all those and use those to determine what are

9    the areas that are required to be cleared and then clear

10   them.

11        Q    Let me show you Exhibit 3 again.  Exhibit 3 is

12   a document you created, correct?

13        A    Correct.

14        Q    In around the operational control bunker, as

15   of September 2021, were there any requirements to clear

16   that area of explosive material?

17        A    Only along Range Road 200, which goes adjacent

18   to the OCB, but it doesn't include the OCB itself.

19   Over.

20        Q    Are there records of the area around Range

21   Road 200 near the operational control bunker, as you see

22   on Exhibit 3, that was actually being cleared of

23   explosive material on or before September 10th, 2021?

24        A    Outside of RR 200 and the other operations

25   that I've already described, no.  Not that I'm aware of.

1      Q    Okay.  All right.  So tell me what RR 2 --

2  what do you mean by RR 200?

3      A    Range Road 200.

4      Q    Oh, okay.

5      A    It's mapped on the map.

6      Q    Okay.  So that -- but that's my question.  Do

7  you have records of the area surrounding Range Road 200

8  near the operational control bunker that were being

9  regularly cleared for explosive material on or before

10  September 10th, 2021?

11      A    I do not.

12      Q    Okay.  So is it fair to say that the area

13  surrounding Range Road 200 near the operational control

14  bunker was not being cleared on or before September 20 -

15  - 2021?

16      A    It was not being regularly cleared.  No.

17      Q    Okay.  Was it being occasionally cleared?

18      A    It may have been.  I don't have records of

19  that though.

20      Q    Okay.

21      A    And I would not expect to have records of

22  that.

23      Q    Let me ask you this.  We were -- again, I'm

24  talking about the area surrounding Range Road 200 near

25  the operational control bunker, as you see on Exhibit 3.

1    column is.  The left and right side of that page matter.

2    So what's the -- what's at the top of that column?

3        Q    So you should be seeing two pages.  On page 5,

4    USN-1769.  The left column is the supplier, and the

5    right column is the receiver.

6        A    Supplier and receiver.  Okay.  Yes.  So the

7    right column --

8        Q    And you --

9        A    Go ahead.

10       Q    Well, I was going to say, you know that the

11   Navy is the receiver, right?

12       A    I do now.

13       Q    So going back to USN-1779, you know the Navy

14   is required to follow all DoD and Navy directives

15   concerning explosive operations, right?

16       A    Yes.

17       Q    Navy is required to follow all applicable Air

18   Force and Eglin Air Force based governing directives for

19   explosive safety, right?

20       A    I would expect that.

21       Q    And you also know -- we can keep going down

22   this document -- that the Navy is required to provide

23   funding for clearance of training and test areas, right?

24       A    I'm not aware of that.  But I -- it would not

25   surprise me.  The funding of this is pretty much outside

```
 1         Q    Okay.  We'll, I mean --
 2         A    When they do occur, then they are -- then the
 3    96 CEG is the focal point for that.  That is the
 4    affirmative statement that's made in this clause.
 5         Q    And you know, going back to range clearance,
 6    the, you know, the -- is it the Air Force that contracts
 7    out to Reliance Test & Technology?
 8         A    Yes.  It is.
 9         Q    Even though the Air Force contracts out to
10    Reliance Test & Technology to -- to do some clearance or
11    identify UXOs in the areas that they do clear.  The buck
12    still stops with the Government on that clearance,
13    correct?
14         A    That is correct.
15         Q    Okay.  I want to show you another instruction,
16    and I don't -- I want to ask you if you've reviewed this
17    instruction.  Okay.  Let me share my screen with you.
18    On your screen, you should be seeing OPNAVINST 3571.4.
19    Do you see that?
20         A    I do.
21              MR. JACOB:  And I'm going to mark this as
22    Exhibit 6.
23         (Exhibit 6 marked for identification.)
24    BY MR. JACOB:
25         Q    Okay.  So you should be seeing Exhibit 6 on
```

1    Breaching policy may increase risk.  It may decrease

2    risk.  It depends on what that breach of policy is.

3    BY MR. JACOB:

4        Q    Okay.  I mean, usually, you put these

5    policies, procedures, and practices in place to try to

6    decrease the risk of harm to people, right?

7        A    That's one of the reasons that we have

8    policies and procedures.  Other reasons we have policies

9    and procedures is for effective operations, conduct of

10   operations, achieving the mission, for example, ensuring

11   people are properly trained, et cetera.  Those are all

12   reasons why we have policy.  Protection of the public is

13   one of those reasons why we have policy.

14       Q    And protection of the people that work on the

15   range, too, right?

16       A    That is correct.

17       Q    Okay.  Let me show you another document.  And

18   I believe you should have this document with you.  Do

19   you see on your screen Air Force Manual 13-212, Volume

20   1?

21       A    I do.  The -- dated 22 June, 2018?

22       Q    That's correct.

23       A    Mm-hmm.

24            MR. JACOB:  And I will mark this as

25   Exhibit 7.

1          (Exhibit 7 marked for identification.)

2    BY MR. JACOB:

3          Q    Colonel, have you reviewed Exhibit 7 prior to

4    today?

5          A    I believe so.  Give me just a second to check

6    the version of the dates, please.  I definitely reviewed

7    a version of that.  I just want to make sure the dates

8    are right.  Because I think this is one of the ones that

9    had two -- two dates.  Yes.  I've reviewed this version

10   of this Air Force manual.

11         Q    And do you see up top, it says, "Compliance

12   with this publication is mandatory"?

13         A    Yes.  I do.

14         Q    You agree that the Government has no

15   discretion to deviate from this policy?

16         A    I agree that the Air Force has no discretion

17   to deviate from this policy.

18         Q    And you agree that the Navy has agreed, in our

19   agreements -- in their agreement with the Air Force to

20   follow these policies, and this one in particular?

21              MR. FISHER:  Object to form.

22              THE WITNESS:  I don't recall exactly what

23   was in the ISA, but I certainly accept that that's

24   probable.  I could go back and look at it, or we could -

25   - I -- I have no problem with that statement.

1      Q    Okay.  Is there -- so let's start with the

2  first premise.  Right?

3      A    Okay.

4      Q    We all -- we agree that according to Air Force

5  policy, munitions, munition debris, target debris,

6  should be considered MPPEH, right?

7      A    There are considered by this manual.  Yes.

8      Q    Okay.  When --

9      A    Agree with that.

10      Q    When you have MPPEH, you said that there's a

11  process for determining whether it is MDAS, material

12  deemed as safe, right?

13      A    That's correct.

14      Q    And what --

15      A    Various processes, actually.

16      Q    Okay.  So that's what I was going to ask you,

17  is, what are the processes under the regulations, the

18  rules the Air Force has, the rules the Government has,

19  to determine whether material is deemed safe?

20      A    So various processes, one of -- one of which -

21  - and I would say -- I might be outside -- this might be

22  too categorical, but I'll go ahead and go -- I'll say it

23  at risk.

24          The processes are, generally, aimed at trying

25  to figure out whether it is or is not safe.  So if there

1    material as safe?

2        A    For that fragmentation --

3              MR. FISHER:  Object to form.

4              Go ahead.

5              THE WITNESS:  For that fragmentation --

6    for that documentation to exist, it would at some point

7    have to be called MPPEH, entered into systems, et

8    cetera.  To answer your question, no, I'm not aware of

9    that.  But I also would not expect to be aware of it.

10   And even if it did exist, I still would not expect to be

11   aware of it.

12   BY MR. JACOB:

13       Q    Okay.  So to be clear, you're not aware of any

14   documentation certifying the material that Mr. Fabozzi

15   was provided by Navy school instructors as material

16   deemed as safe, right?

17       A    That is correct.

18       Q    Let's go back to the clearance requirements.

19   And this -- we're going back to Exhibit 7.  And I want

20   to show you page 55 of Exhibit 7.  Do you see page 55 of

21   Exhibit 7?

22       A    I do.

23       Q    And we can zoom in a little bit to make it a

24   little more readable.  Do you see paragraph 5.3.4?

25       A    I do.

1      Q    It says Range Clearance Requirements.

2      A    I do.

3      Q    It says, "EOD Personnel will clear active

4   ranges used for munition expenditures [in accordance

5   with] the minimum requirements defined in the following

6   subparagraphs."  Did I read that correctly?

7      A    Yes.

8      Q    And if you look at the last sentence of

9   paragraph 5.3.4, it says, "EOD personnel will," do you

10  see that?

11     A    I do.

12     Q    So it says "EOD personnel will:

13          "Clear target access roads and the area 50

14  feet on either side [of] clearance operations or

15  [clearance] maintenance activities."  Did I read that

16  correctly?

17     A    Yes.

18     Q    To be fair, what this policy is saying is that

19  the Air Force personnel are supposed to clear range

20  access roads and 50 feet on either side of those range

21  access roads for UXOs, correct?

22     A    Again, don't insert the word UXOs in there.

23  Range clearance is a broader category than just UXOs.

24  And in some cases, it's not EOD personnel who do all of

25  the operations.  They do conduct operations.  They don't

1   necessarily conduct all of the operations.

2        Q    Sure.  I understand range clearance is

3   broader, but range clearance includes clearance of UXOs,

4   correct?

5        A    That is correct.

6        Q    Okay.  I want to go back then to another

7   exhibit that you brought with you.  I don't think we --

8   we don't need to mark it, but I can share my screen with

9   you and show it to you.  So on your screen, you

10  recognize this document, right?  Or the series of

11  documents?

12       A    I recognize the type of document.  Yes.

13       Q    Can you tell me what the relevance of these

14  documents are for either range clearance purposes or for

15  your topic, if anything?

16       A    I was not the source of these.  I think what

17  you're asking is why -- are you asking why I have them

18  in the binder?

19       Q    Yeah.

20       A    They were provided to me --

21       Q    Okay.

22       A    -- by Counsel.

23       Q    Did you look at the dates of each of these

24  incident reports?

25       A    Yes.

1    it just sounds like it's a single detonation.  So that's

2    what was happening here.

3             There's some nuances that I really can't speak

4    to, and it's not clear in this document about what the

5    timing was among the three different -- and it may have

6    even been four piles.  I think it was three piles.  But

7    from an explosives person, that matters a lot.  What was

8    the timing, what was the distance, et cetera.

9        Q    All right.  I guess going back to my question,

10   though, they -- he -- this is not me.  This is Beall

11   saying that they exceeded the authorized limits by 1400

12   NEW, right?

13       A    That's what it says.  Yes.

14       Q    And in paragraph c, he says the operations

15   were not being tamped, right?

16       A    That's correct.

17       Q    Said the policies require them to be tamped

18   with earth overburden?

19       A    As I understand at the time, they were

20   required to be tamped.

21       Q    Okay.  And he found no evidence of that ever-

22   taking place, right?

23       A    I think that's the case.  Yes.  That's what it

24   says.

25       Q    In your -- in your version of the memo, does

1    term -- and now you've got to do something with that.

2              We are much more comfortable responding

3    to misfired munitions where you have access to it.  You

4    can see the state of the fuse, for example, and know how

5    to handle it appropriately.  When it's underground, you,

6    kind of don't know what you got.  So that's -- as I

7    understand -- that that's the primary reluctance to

8    tamping.  I don't know that it has anything to do with

9    the directionality of the blast, making it

10   omnidirectional or making it no longer omnidirectional.

11   BY MR. JACOB:

12       Q    Lack of tamping and an -- and an increased net

13   explosive weight can cause fragments to travel farther

14   than they would otherwise, right?

15       A    I would agree with that.

16       Q    And that -- this goes back to that safety

17   profile that we were discussing earlier, right?  If

18   you're expecting a certain zone of danger and then a

19   certain area that's supposed to be safe, if you're not

20   following those safety directives on how much net

21   explosive weight you're using, how, you know, whether

22   you're tamping or not, you can't reliably say that an

23   area is safe, right?

24       A    I would never rely -- I would never say an

25   area is safe.  Again, I would define what is the danger

1   from the particular failure mode or the particular

2   activity that we're doing and say you are safe from that

3   failure mode.  The area to -- to your point, the area

4   that I would designate as the safety profile would be

5   different for different size NEW.

6        Q    I guess let's talk about the flip side of

7   that.  The area that you would designate as the danger

8   zone would be much larger than otherwise, right?

9        A    Yes.  When I say the word safety profile,

10  that's -- when you just said danger zone, I think, your

11  intent was the same as when I said the word safety

12  profile.  That's the terminology we use.

13       Q    Yeah.

14       A    We don't say safety zone, but we use safety

15  profile to say -- it's -- it's almost a backwards

16  definition, I agree.  This is the area that's least

17  safe.  So to be able to conduct this operation, you have

18  to clear people out of the safety profile, i.e. the

19  danger zone.

20       Q    Let's go back to that memo.  And I'll show you

21  a different portion of that memo.  This is Exhibit 2.

22  Let me ask you, when was the first time you saw Exhibit

23  2?

24       A    It's been more than a week.

25            MR. FISHER:  Your question -- to be

1          CERTIFICATE OF REPORTER

2

3          I, Skyler Daniels, hereby certify:

4          That the foregoing proceedings were taken

5     before me at the time and place therein set forth;

6          That the proceedings were recorded by me and

7     thereafter formatted into a full, true, and correct

8     transcript of same;

9          I further certify that I am neither counsel

10    for nor related to any parties to said action, nor in

11    any way interested in the outcome thereof.

12

13          DATED, this 26th day of December 2023.

14

15

16

17          Skyler Daniels, CER 1973

18          Court Reporter

19

20

21

22

23

24

25

# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA PENSACOLA DIVISION

| | |
|---|---|
| **WAYNE FABOZZI** and **WENDY FABOZZI**,<br>　　　　Plaintiffs<br>vs.<br>**UNITED STATES OF AMERICA**,<br>　　　　Defendant | **NO.**<br>**3:23-CV-10474-TKW-HTC** |

## PLAINTIFFS' NOTICE OF DEPOSITION

To:  Defendant, United States of America, through its Attorneys of record.

Please take notice that under Fed. R. Civ. P. 30(b)(6), the above Plaintiffs will take the deposition of the Defendant, United States of America, by oral examination using video, audio, and stenographic means, at the following location and date:

Date and Time:  Dec. 5 (9am CST); 6 (10am CST); 7 (10am CST & 1pm CST), 2023

Location:  4359 Lafayette Street, Marianna, Florida 32446.

Court Reporter:  Remote Legal or designee

Videographer:  Remote Legal or designee

The deposition will continue from day to day until completed, with such breaks, as necessary. Pursuant to Rule 30(b)(6), the United States of America shall designate one or more officers, directors, managing agents, or other persons who consent and are knowledgeable to testify on the United States' behalf with respect to the subject matters set forth in attached **Exhibit A**. A request to produce documents permitted under Rule 30(b)(2) is attached as **Exhibit B**.

## DEFINITIONS

The following definitions apply to this Deposition Notice and attached Exhibits.

**Naval School**. The Naval School refers to Naval School Explosive Ordnance Disposal at Eglin Air Force Base in Florida.

**Range at Issue**. The term "Range at Issue" means the Range C-52N as identified by the document page bates stamped by the Government as USN-3090.

**Safe Area at Issue.** The term "Safe Area at Issue" means the area identified as the "Accident Site" on the document page bates stamped by the Government as USN-3090 and USN-3091.

**Communication.** The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

**Document.** The term "document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a). A draft of a nonidentical copy is a separate document within the meaning of this term.

**Identify** (With Respect to Persons). When referring to a person, to "identify" means to give, to the extent known, the person's full name, present or last known address, e-mail address, and telephone number, and when referring to a natural person, additionally, the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

**Identify** (With Respect to Documents). When referring to documents, "to identify" means to give, to the extent known, the (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s), and recipient(s). If the document is a publication, please include the publication name,

publisher, and section, portion, page or pages of the publication, or any other information necessary for Parties to procure a copy.

**Parties.** The terms "plaintiff" and "defendant" as well as a party's full or abbreviated name or pronoun referring to a party mean the party and, where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates. This definition is not intended to impose a discovery obligation on any person who is not a party to the litigation.

**Person.** The term "person" is defined as any natural person or business, legal or governmental entity or association.

**Concerning.** The term "concerning" means relating to, referring to, describing, evidencing, or constituting.

Respectfully Submitted,

/s/ Tom Jacob
JAMAL ALSAFAR
    jalsaffar@nationaltriallaw.com
    Texas State Bar #24027193
TOM JACOB
    tjacob@nationaltriallaw.com
    Texas State Bar #24069981
WHITEHURST, HARKNESS,
    BREES, CHENG, ALSAFFAR,
    HIGGINBOTHAM, & JACOB
    P.L.L.C.

1114 Lost Creek Blvd, Ste. 410
Austin, TX 78746
(512) 476-4346 (o)
(512) 467-4400 (f)


B. SHANNON SAUNDERS
   ssaunders@saunderslawfirm.com
   Florida State Bar #178233
Camerin J. Dixon-Hatcher
   chatcher@saunderslawfirm.com
   Florida State Bar #1025111
B. Shannon Saunders, P.A.
4359 Lafayette Street
P.O. Box 5896
Marianna, Florida 32447
(850) 526-5535 (o)
(850) 526-5586 (f)

Attorneys for the Plaintiffs


# CERTIFICATE OF SERVICE

By our signature above, we certify that a copy of this pleading has been sent on September 18, 2023, via email, per the stipulation of the parties.

## EXHIBIT A

Examination is requested on the following subject matter areas:

1.    Differences between the Rule 34(a)(2) inspection to be conducted on October 28, 2023, and the Safe Area at Issue and Range at Issue as they existed on September 10, 2021. This topic includes the briefings or other instructions provided in the inspection compared to briefings or instructions provided to Mr. Fabozzi on any date.

2.    Periodic clearance of explosives or munitions in the Safe Area at Issue at the Naval School. This topic includes identification of documentation or record keeping of such clearance, as they existed on September 10, 2021, and presently.

3.    Policies, procedures, standard operating procedures, instructions, or other rules, regulations, or standards concerning periodic or non-periodic clearance of explosives or munitions at the Naval School, as they existed on September 10, 2021, and presently. This topic includes discussion of the application of these policies to the Government and third parties.

4.    Hazard Control Briefing or safety preps at the Naval School, including the identity of documentation, record keeping, or logging of such briefing, as they existed on September 10, 2021, and presently.

5.    Policies, procedures, standard operating procedures, instructions, or other rules, regulations, or

standards concerning periodic or non-periodic Hazard Control Briefing (or other safety prep) at the Naval School, including the identity of documentation, record keeping, or logging of such briefing, as they existed on September 10, 2021, and presently. This topic includes discussion of the application of these policies to the Government and third parties.

6.   History of Material Potentially Possessing Explosive Hazards and certification of Material Hazard Deemed Safe at the Naval School during the time in which Mr. Fabozzi worked at the Naval School, including the identity of logs or record keeping of such certification.

7.   Policies, procedures, standard operating procedures, instructions, or other rules, regulations, or standards concerning History of Material Potentially Possessing Explosive Hazards and certification of Material Hazard Deemed Safe at the Naval School, including any logging or record keeping of such certifications, as they existed on September 10, 2021, and presently. This topic includes discussion of the application of these policies to the Government and third parties.

8.   Policies, procedures, standard operating procedures, instructions, or other rules, regulations, or standards concerning the Net Explosive Weight for the Ranges at the Naval School. This includes any limitations set either by written or unwritten policy, procedure, instruction, or custom, as they existed on September 10, 2021, and presently. This topic includes discussion of the application of these policies to the Government and third parties.

9.     The identity and actions of the Range Control Of-
       fice and any Range Control Officer at the Naval
       School during the five (5) years preceding the ex-
       plosion at issue in this lawsuit.

10.    The Government's policies, procedures, protocols,
       and practices regarding safety and security of ex-
       plosives at the Naval School for Explosive Ord-
       nance Disposal, including storage, inventory,
       tracking, monitoring access, and protocols for un-
       secured explosives, generally and as applied to the
       lawsuit at issue, as they existed on September 10,
       2021, and presently. This topic includes discussion
       of the application of these policies to the Govern-
       ment and third parties.

11.    The government's policies, procedures, protocols,
       and practices regarding training of employees, con-
       tractors, and students on safety protocols and iden-
       tifying and handling any material found at the
       Range at Issue or Safe Area at Issue, as they ex-
       isted on September 10, 2021, and presently. This
       topic includes discussion of the application of these
       policies to the Government and third parties. This
       topic further includes any mishap investigation fol-
       lowing a mishap occurring because of such found
       material.

12.    Oversight and supervision of contractors, including
       Plaintiff Wayne Fabozzi, working at the Naval
       School, including their duties, training, and moni-
       toring while on premises, as they existed on Sep-
       tember 10, 2021, and presently.

13.    The government's knowledge prior to September 10, 2021, regarding any hazards, safety issues, or dangers regarding unexploded ordnance in the designated safe zones or operational bunkers, including the Range at Issue and the Safe Zone at Issue. This topic also includes any mitigation efforts the Government may or may not have taken regarding these areas.

## EXHIBIT B

Under Fed. R. Civ. P. 34(b)(2), you are commanded to attend and testify at the above specified time and place; you are commanded to produce the below designated documents, electronically stored information, or tangible things in your possession, custody, or control. The following requests do not seek any communication to or from your legal counsel. Please produce a true and correct copy of the following within thirty (30) days of this notice or at the deposition, whichever is sooner. If produced before the deposition date, please produce these documents electronically. If produced at the deposition, please produce a physical copy of the document for examination and marking as a deposition exhibit, as well as an electronic version of the document in its native format.

1. Your current curriculum vitae or resume.

2. Documents you reviewed in preparation for this deposition.

3. Policies, procedures, practices, checklists, or protocols concerning the topics covered in Exhibit A, if not previously produced by the Government.

4. Reports, notes, logs, letters, communication, or other documents you have authored or have been sent to you concerning this case or the topics covered in Exhibit A.



OCB

Range Road 200

blow-hole

Boundary of Dedicated Impact Area (dashed line)