1           IN THE UNITED STATES DISTRICT COURT FOR

2      THE NORTHERN DISTRICT OF FLORIDA, PENSACOLA DIVISION

3    _____

4    WAYNE FABOZZI and WENDY

5    FABOZZI,

6          Plaintiffs,            Case No:

7      v.                         3:23-CV-10474-TKW-HTC

8    UNITED STATES OF AMERICA,

9          Defendant.

10   _____

11                  VIDEOTAPED DEPOSITION

12   _____

13

14   WITNESS:          ROBERT SNIDER

15   DATE:             Wednesday, December 6, 2023

16   START TIME:       11:07 a.m., ET

17   END TIME:         3:34 p.m., ET

18   REMOTE LOCATION:  Remote Legal platform

19   REPORTER:         Andrew Adams, CER-1632

20   JOB NO.:          21414

21

22

23

24

25

1    publication's process supervisor. But as my positional

2    authority, that SOP falls under my position.

3       Q    Okay.  So one of your responsibilities at the

4    time of the explosion was providing supervisory

5    oversight of the publication and standard operating

6    procedure that deals with -- deals with hazard control

7    briefings or hazard safety briefings?

8       A   Yes.

9       Q    Okay.  And this is, again, a terminology thing

10   so I don't have to repeat it over and over again, but I

11   know the terms -- are those interchangeable? Hazard

12   control briefing, hazard safety briefing?

13      A    Yes.

14      Q    Okay.  And can you, in your words, tell me

15   what a hazard control briefing/hazard safety briefing

16   is?

17      A    It is any type of -- the safety briefing, a

18   hazard control briefing is required by higher level

19   guidance to be given to any workers that are involved in

20   the A and E, ammunition and explosive, operation.

21      Q    Okay.  So when we say HCB for short, we're

22   talking about hazard control briefings, which are the

23   safety briefings you just described, correct?

24      A    Yes.

25      Q    Okay.  I'll try to use that for shorthand, if

1   I can remember to. And you're -- you said that HCBs,

2   these safety briefings, are required to be given to any

3   workers in the A and E operations?

4       A   Yes.

5       Q   And A and E stands for?

6       A   Ammunition and explosives operation.

7       Q   Were -- at the time of this explosion, were

8   HCBs required to be given to workers who were not in the

9   A and E operations?

10      A   No.  They're not required.

11      Q   At the time of the explosion, was Mr. Fabozzi

12  classified as a worker who was not a part of the A and E

13  operation?

14      A   That contradicted itself? He was never

15  classified as a worker, but, yes, he was not part of the

16  A and E operation. So that term just conflicted.

17      Q   Got it. Thank you. So at the time of the

18  explosion, Mr. Fabozzi was not required to get an HCB

19  briefing on the day of the explosion?

20      A   That is correct.

21      Q   Okay.  And based on your knowledge and review,

22  Mr. Fabozzi was, in fact, not given an HCB briefing by

23  the military on the day of the explosion, correct?

24      A   That's correct. Correct.

25      Q   Okay.  I want to go back to the deposition

1      Q    Okay.  I'm going to show you topic number 5.

2    Hold on. Okay.  Bring all to me. Can you see topic

3    number 5?

4      A    Yes.

5      Q    I'm going to show you the rest of 5, which is

6    on the next carryover page. Can you see that?

7      A    Yes.

8      Q    Okay.  And can you see topic number 8?

9      A    Yes.

10     Q    And then topic number 9 and 11?

11     A    Yes.

12     Q    Okay.  And the US Government designated you as

13   the corporate representative to speak on behalf of the

14   Government on topics 1, 4, 5, 8, 9, and 11. Is that

15   your understanding?

16     A    No.

17     Q    Okay.  What is your understanding?

18     A    Part of one.

19     Q    Okay.  That's fair actually. I think if I'm –

20   – thank you for bringing that up because it's not on the

21   actual exhibit. Part of number 1 that you're referring

22   to is you will be speaking as a representative of the

23   Government related to topic number 1 only as it relates

24   to the hazard briefing only, correct?

25     A    Correct.

1      Q    In other words, the HCB we talked about

2  earlier, correct?

3      A    Yes.

4      Q    Okay.  And as for the other topics, 4, 5, 8,

5  9, and 11, you're the -- you -- you do understand that

6  you're the Government's representative to speak on those

7  topics in full, correct?

8      A    Yes.

9      Q    Okay.  And I think we talked about this a

10  little bit earlier. You've identified the documents

11  that you've reviewed. We did this off the record. Do

12  you have a collection of the documents that you reviewed

13  in preparing yourself to provide testimony as the

14  Government's (30)(b)(6) representative?

15      A    Yes.

16      Q    Okay.  This is -- this is kind of important.

17  We need to get this on the record. Would you mind just

18  describing the documents that you reviewed in

19  preparation for giving your testimony. And you can

20  provide on the instructions, Mr. Snider, you can just

21  provide the instruction number. You don't have to go

22  through the whole thing, just the instruction numbers.

23  And then if you have notes, say, these are my personal

24  notes, et cetera.

25      A    NAVSCOL 8027.1 Alpha and Bravo.

1      Q    -- binder? Okay. Is it an instruction, a

2    manual? Can you give a little meat on that bone, if you

3    don't mind?

4      A    It is a briefing that's built in accordance

5    with the instruction to cover the guidance of giving a

6    safety brief. It includes types of ordinance that could

7    be encountered. It includes what not to do. That's the

8    way the instructions -- nobody's allowed to pick

9    anything up unless you're certified or an EOD

10   technician. You're not allowed to touch UXOs. So it

11   specifically says who can and who cannot touch a UXO,

12   and it goes -- just gives points to contacts if

13   encountered in the process.

14     Q    Okay.  And I know we timed these briefings,

15   but just based on your memory, how long was the briefing

16   that you provided as an exemplar briefing on October

17   28th, 2023? The one in the parking lot?

18     A    Don't recall.

19     Q    Okay.  It was a few minutes. Is that fair?

20     A    Yes.

21     Q    Okay.  At least, at the October 28th, 2023,

22   briefing, there -- there were no booklets or documents

23   that we were required to sit down with and go through,

24   correct? It was just a verbal briefing?

25     A    Correct.

1     Q    But there was one document. It was just a

2    document that everyone had to sign saying that they

3    received a briefing, correct?

4     A    Correct.

5     Q    Okay.  So the several minutes briefing, or the

6    few minutes briefing that you said and the signature

7    that we did, that would be -- does that -- did that

8    mirror accurately the same type of briefing any other

9    personnel would receive who were entering the range and

10   were not part of the military and not part of the

11   explosion exercise?

12    A    Yes.  It's the same similar brief based off

13   the same guidance that Eglin Air Force Base uses -- it's

14   their reservation -- and Jackson Guard uses for

15   civilians who hunt and enter that reservation.

16   Anybody's required to get that same brief.

17    Q    And we had to sign that we had received that

18   safety briefing as non-military personnel, and we had to

19   date it. Is that correct?

20    A    Yes.

21    Q    All right. And then what happens to that

22   record of the briefing occurring for non-military

23   personnel where we sign and date it? What -- what is

24   supposed to happen to that record when it actually, you

25   know -- when we're talking about daily or visits by non-

1    Snider? I flipped it for you so it's easier to read.

2              THE WITNESS: It's fine.

3    BY MR. ALSAFFAR:

4    Q   Okay.  This is enclosure 10 of your -- of your

5    memo that's got a starting Bates number of USN31. Is

6    this the signed acknowledgment that you were referring

7    to related to Mr. Fabozzi that you attached to your

8    command investigation?

9    A   Yes.

10    Q   And at the top it says, "personnel briefed on

11   NAVSCOLEOD UXO awareness"; is that right? Did I read

12   that correctly?

13    A   Yes.

14    Q   Okay.  And then underneath it, it says, "must

15   be conducted by onsite supervisor or safety rep". Do

16   you see that?

17    A   Yes.

18    Q   So is this describing the safety briefing that

19   you would have provided or some other supervisor would

20   have provided in the parking lot area for nonmilitary

21   personnel?

22    A   Nonmilitary personnel has nothing to do with

23   this brief. This brief is the same brief that's

24   conducted for anybody.

25    Q   Okay.  This is the same brief that you gave to

1     Q    And the date on this one is March 27th, 2018.

2   You see that?

3     A    Yes.

4     Q    And the briefer is Mr. Severino that you

5   mentioned, correct?

6     A    Yes.

7     Q    All right. So as far as we can tell, based on

8   your command investigation and your own files, the --

9   the only safety briefing Mr. Fabozzi received, or the

10  most recent safety briefing he received at Eglin was

11  March 27th, 2018, correct?

12    A    That -- that's the last that I would have had

13  record for.

14    Q    Okay.

15    A    That's all I can attest to.

16    Q    That's fine.

17    A    If he received more, I -- I don't know.

18  There's no records --

19    Q    Okay.

20    A    -- of it that I have.

21    Q    Is it my understanding that one of the -- one

22  of the -- one of your -- let me close that now that

23  we're done talking about it. Is it my understanding

24  that one of your -- one of the things you were trying to

25  do in your command investigation for this explosion was

1    personnel were given a refresher briefing in 2018,

2    correct?

3        A    That's how I understand it.  I did not work

4    here at the time.

5        Q    Understood. And that kind of goes back to

6    topic 1, where one of the topics was tell us any

7    differences and when and the last ones were given, et

8    cetera. So that's helpful. And all I'm asking is for

9    your understanding.

10           So when you did the command investigation --

11   just to put a bow on this, when you did the command

12   investigation, the only evidence of any safety briefing

13   given to Mr. Fabozzi was one that was given in March of

14   2018. Is that correct?

15       A    In regards to UXOs? Yes.

16       Q    Okay.  So let me re-ask it with that because I

17   want to get it correct. So the only safety briefing

18   that Mr. Fabozzi was given relating to UXOs that you

19   could find in any of the files or any of the

20   documentation was one that was given in 2018, correct?

21       A    Yes.

22       Q    So based on your command investigation that

23   Captain Beall asked you to do relating to this

24   explosion, one of the items he asked you to look into

25   was, let me know what kind of safety briefings were

1    given to the medical personnel like Mr. Fabozzi. Is

2    that part of your investigation that you did for him?

3         A    I -- I don't recall the specifics. It could

4    be.

5         Q    And when you did your command investigation

6    into what happened and what led to the explosion,

7    there's no evidence that you could find that Mr. Fabozzi

8    or any other personnel -- nonmilitary personnel were

9    given a UXO safety briefing on September 10th, 2021. Is

10   that fair?

11        A    That is correct. It's not required.

12        Q    okay.  And -- and let me ask you a different

13   question. So I didn't ask you whether it was required

14   or not.  We'll get into that because I think that's a

15   very good point. So let's break this up.

16            First, my understanding is, your -- as the --

17   as the Government representative on this topic, your

18   understanding is that the Government does not require

19   that any safety briefing is given to nonmilitary

20   personnel related to unexploded ordinances every time

21   they come to the range at Eglin Air Force Base. Is that

22   fair?

23                 MR. FISHER: Object to form.

24                 THE WITNESS: It has nothing to -- you

25   keep saying nonmilitary personnel. It has nothing to do

1    over the glass windshields. And he found the item

2    sitting right there on that grate directly above where

3    the detonation occurred directly below the top of that

4    overhead where all the meat was.

5          So it went straight up, hit it, and then came

6    to rest on that metal grate. Sergeant First Class Malm

7    recovered the item, turned it over to his senior chief,

8    which was Senior Chief Young. Senior Chief Young

9    brought it and turned it over to me.

10   Q    Thank you. What was the item, specifically?

11   A    It was a 40 millimeter point detonating fuze.

12   Q    How large was it? Approximately?

13   A    40 millimeters.

14   Q    So when you say it's a 40 millimeter fuze,

15   that's the actual size of the remnant or debris that you

16   --

17   A    That's the actual size of the item.

18   Q    Recovered, or the item if it had not exploded?

19   A    The item was intact. The only thing missing

20   from --

21   Q    Oh, okay.

22   A    -- the item was the booster coupler. Because

23   it functioned as designed. It would have came from

24   together if it still had the explosive projectile on it,

25   but it did not.  It was just the fuze. So all that

1    detonated was the booster coupler.

2      Q   Got it. So the fuze itself was entirely

3    intact and recovered at the scene?

4      A   For the most part. The booster coupler sits

5    below it, and when it came from together, you can see it

6    splayed the --

7      Q   Yeah.

8      A   -- the threading. So --

9      Q   I can see that. Okay. Got it. Here's what

10   I'm going to do real quick. I am going to see if I can

11   find an exhibit because I think I have something that

12   will help. So give me just a second. Let me go back to

13   -- back to it real quick, see if I can pull it up

14   easily. Just do this.

15       Okay, Mr. Snider, I'm pulling up some picture

16   that might be helpful to wrap this part of it up at

17   least. Okay, here we go. Okay, I'm showing you a photo

18   that was provided -- I'm about to show you a photo that

19   was provided to me by Mr. Fisher on November 29th. Tell

20   me when you can see the --

21     A   Yes.

22     Q   Okay, I am showing you a picture. Can you

23   tell me what I -- what we're looking at? Tell me what

24   we're looking at right now.

25     A   The exact item we were just discussing. 40

1            MR. ALSAFFAR: Okay. Thank you, Mr.

2    Snider. Whenever that happens I have no idea if I'm

3    frozen. It looks fine to me.  I'm hearing you fine,

4    moving -- so whenever that happens, just pipe in, and

5    we'll kind of work our way through it.  I still think

6    you'd prefer me to be in this mode than sitting across

7    from you, so I appreciate the help on that.

8    BY MR. ALSAFFAR:

9        Q   If you look on Exhibit 5 on the first page

10   here, under enclosures, encl., do you see that they have

11   a UXO reporting and actions process flowchart? Do you

12   see that?

13       A   If you're referring to me, yes, I'm aware of

14   that.

15       Q   Okay.  Okay. And then the number 2 enclosure

16   is a UXO reporting -- suspect UXO reporting and actions

17   process flowchart for non-working hours. So they have a

18   flowchart of what to do during working hours and one for

19   non-working hours, correct?

20       A   Correct.

21       Q   Okay.  So let's go to that. I just want to

22   show that to you, because -- I get there. I will tell

23   you. Okay. Can you see the document? This is the same

24   instruction, the flow sheet. That is the suspect UXO

25   reporting --

```
1        A    Yes.

2        Q    -- instructions for working hours. You see

3   that?

4        A    Yes.

5        Q    Okay.  And under this flowchart, it says

6   suspect UXO located. So you see that circled box at the

7   top? That means that somebody on the range suspects

8   that there might be an unexploded ordinance that they've

9   located, correct?

10       A    Yes.

11       Q    The instruction requires them to call TTO. Is

12   that right?

13       A    Correct.

14       Q    And what is -- can you tell us what TTO means?

15       A    It's a training timeout. That's for everybody

16  to stop the training evolution.

17       Q    What does training timeout, stop the training

18  evolution mean?  Stop what you're doing?  Is that what

19  it means?

20       A    No.  Not stop what you're doing. Stop the

21  training evolution.

22       Q    Got you. Okay. Can you -- so when you say

23  call a training time out, if you're in the middle of a

24  training exercise, someone suspects a UXO has been

25  located somewhere on the range where the training
```

1   exercise is occurring, how does the TTO occur?

2       A   Anybody on range can see a problem or a safety

3   issue for any reason, and they would call a training

4   timeout. Not -- not freeze, but training -- stop

5   training. Correct.

6       Q   And anyone can do a -- call a TTO?

7       A   That is correct.

8       Q   All right. And does it have to be

9   communicated to a certain person, an instructor,

10  supervisor, in order for the TTO to occur?

11      A   It needs to get to the supervisor. How it

12  gets there can be communicated to any higher-level, like

13  a student to an instructor, then that instructor to the

14  RSO, and that RSO -- but yes, it needs to get to the

15  person who's in charge of that evolution.

16      Q   Got it.

17      A   But a student may not have access to that

18  person, so he's going to use a chain of command. But

19  yes, anybody can stop the training.

20      Q   All right. So anyone can stop the training,

21  including a student, or a student communicating to a

22  supervisor instructor to stop the training?

23      A   Correct.

24      Q   Okay.  Then the next step, it says, according

25  to the instruction, is notify supervisor. You see that?

```
 1      A   Yep.

 2      Q   So following a timeout of the training

 3  exercise, then a supervisor must be notified. So that's

 4  when you have to get a supervisor involved, correct?

 5      A   We're going up different levels of

 6  supervision. Yes.

 7      Q   All right. So you notice -- someone,

 8  including a student, suspects a UXO -- a unexploded

 9  ordinance is on the range. A student or any supervisor

10  can call a TTO, but then after that they have to notify

11  a supervisor instructor-type person of the suspected

12  UXO, correct?

13      A   Correct.

14      Q   All right. Then the arrow goes to the right and

15  says, on-site staff evacuate all personnel to 638 feet

16  or greater, mark location and post a staff guard.

17      A   Correct.

18      Q   Okay.  Do you agree with that instruction?

19      A   Yes.

20      Q   Okay.  And is this a mandatory instruction?

21  Like, you have to do this or --

22      A   I don't -- I don't know where you're going

23  with that. I don't know if there's an -- there's an

24  optional instruction. I've never heard of one of those.

25      Q   That's what I mean. Like, if you see a
```

1    suspected UXO, it's not like, you know what? I don't

2    have to evacuate people. I don't have to do this. I'll

3    just -- maybe sometimes I will, sometimes I won't. This

4    instruction is saying, no, no, no. If you suspect a

5    UXO, this is what you need to do.

6        A    Correct.

7        Q    You don't have, like, discretion to say, I

8    don't want to follow this. I don't -- right?

9        A    It's not a want, it's can you?  But yes.

10       Q    Okay.

11       A    If you can't do something, you can't do it. I

12   don't think it's a matter of want. No, you don't have

13   the ability to not want to do something.

14       Q    And that's probably a better way of describing

15   it. That's exactly what I meant, is you don't have the

16   discretion to make your own judgment call that I don't

17   have to do this. If you can do it, the instruction is

18   saying you have to do it.

19       A    Correct.

20       Q    Okay.  So when we talk about this part that

21   says, on-site staff evacuate all personnel to 630 feet

22   or greater, let's talk about it piece by piece. What

23   does that mean?  How does that look like? What does

24   that look like?

25       A    That 638 feet is based on the largest known

1    flowchart is the same.

2        Q    Okay.  Listen, I can pull it up because I

3    don't want to --

4        A    The course of action is the same.

5        Q    Okay.  Great. And we'll pull it up just to

6    verify because I don't want to put words in your mouth.

7    I promised you I would not do that. So I just didn't

8    know if you knew off the top of your head. So okay.

9            So good explanation there. That makes sense.

10   So the on-site staff, is that -- I'm sorry if this is

11   obvious, but does on-site staff include anybody on site

12   or who is that referring to that needs to evacuate all

13   personnel to 638 feet or greater?

14       A    Staff are people that are employed at the

15   Naval School EOD as staff instructors. So any staff.

16       Q    Got it. So that would be military students?

17       A    Not students. It separates staff from

18   students.

19       Q    That was my question. So we're talking about

20   instructors, supervisors, et cetera. And on September

21   10th, 2021, your investigation revealed there were

22   numerous folks -- staff, on-site staff, instructors --

23   that were at both the range demo site, but also at the

24   bunker site where Mr. Fabozzi was, correct?

25       A    Correct.

1      A   The only reason you're marking it is to pass

2   on that to the EOD flight so they can relocate it.

3      Q   Right. Okay.  And I was thinking, too, that

4   that's a safety precaution, right? To make sure nobody

5   stumbles upon it.

6      A   No.  It wouldn't be a safety precaution --

7      Q   Okay.

8      A   -- because nobody should have access to that.

9   That's why you have a posted guard if it's accessible to

10   anybody else.

11      Q   Okay.  That makes sense. And also why you

12   evacuate?

13      A   Yes.

14      Q   You've already gotten everyone out there.

15   Okay, so tell me about the post a staff guard part of

16   it. Tell me what that looks like, what that means. Are

17   they posted right there or they posted somewhere --

18      A   They are posted 638 feet away or in a

19   protected area, if I can determine that as an EOD tech,

20   which we can. We're authorized to do that. So that

21   bunker --

22      Q   That would be a --

23      A   We could minimize that distance.

24      Q   Got it.

25      A   But let's put it in reference. On Charlie 51,

1    where I work, that area is accessible to anybody.

2        Q    Which area?

3        A    I would have to do that procedure. 52 North

4    is not accessible to anybody.

5        Q    Okay.

6        A    I wouldn't have to post a guard on North,

7    because it's not an -- it's a restricted area. It's not

8    accessible to anybody. I would just have to mark it --

9        Q    Got it.

10       A    -- and call EOD.

11       Q    And evacuate personnel who are allowed to be

12   there.

13       A    Correct.

14       Q    All right. Now, I think -- I don't, again --

15   again, I don't want to put words into your mouth because

16   I think you did a great job of describing this. So tell

17   me if my understanding is correct. I think you

18   mentioned that when we talk about this evacuation

19   personnel to a safe distance of 638 feet or greater from

20   the suspect unexploded ordinance you mentioned that

21   that's an open space. But if there's a bunker like the

22   OCB bunker that the instructors and Mr. Fabozzi were at

23   on September 10th, 2021, that going inside that bunker

24   would be a safe evacuation point. Did I understand that

25   correctly?

1      A    If that bunker was there and that suspect UXO

2    was outside, I could reduce that number to zero.

3      Q    Okay.  So in other words, people go inside the

4    bunker, shut the doors?

5      A    Correct. That's -- that's an option, yes.

6      Q    Okay.  And --

7      A    It wouldn't be a smart option. But it would

8    be an option.

9      Q    And why -- tell me why it would not be a smart

10   option.

11     A    Because now you're stuck in there waiting on

12   EOD to respond. It wouldn't make any sense. You just

13   mark it and evacuate the area. It's a restricted area.

14     Q    Okay.  All right. So you could either --

15   let's say a suspected UXO is identified at the -- at or

16   near the OCB bunker like it was in September 10th, 2021.

17   The instruction -- the mandatory instruction says you

18   can have one or two options. You can all go into the

19   bunker and shut the door that's right there a few feet

20   from you, or you can go to 638 feet down range, or up

21   range, away from wherever that UXO was located. Is that

22   a fair summary?

23     A    Yes.  There's -- I -- we could go on all day

24   about different scenarios, but yes.

25     Q    Right. Right, but all those scenarios would

```
 1                    CERTIFICATE OF REPORTER

 2

 3            I, Andrew Adams, hereby certify:

 4            That the foregoing proceedings were taken

 5     before me at the time and place therein set forth;

 6            That the proceedings were recorded by me and

 7     thereafter formatted into a full, true, and correct

 8     transcript of same;

 9            I further certify that I am neither counsel

10     for nor related to any parties to said action, nor in

11     any way interested in the outcome thereof.

12

13            DATED, this 27th day of December, 2023.

14

15

16     _____

17            Andrew Adams, CER-1632

18            Court Reporter

19

20

21

22

23

24

25
```

# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA PENSACOLA DIVISION

| | |
|---|---|
| **WAYNE FABOZZI** and **WENDY FABOZZI**,<br>        Plaintiffs<br>vs.<br>**UNITED STATES OF AMERICA**,<br>        Defendant | **NO.**<br>**3:23-CV-10474-TKW-HTC** |

## PLAINTIFFS' NOTICE OF DEPOSITION

To:  Defendant, United States of America, through its Attorneys of record.

Please take notice that under Fed. R. Civ. P. 30(b)(6), the above Plaintiffs will take the deposition of the Defendant, United States of America, by oral examination using video, audio, and stenographic means, at the following location and date:

Date:  Nov 6, 2023

Location:  1114 Lost Creek Blvd, Ste 410
Austin, TX 78746

Time:  10:00 AM CST

Court Reporter:  Remote Legal or designee

Videographer:    Remote Legal or designee

The deposition will continue from day to day until completed, with such breaks, as necessary. Pursuant to Rule 30(b)(6), the United States of America shall designate one or more officers, directors, managing agents, or other persons who consent and are knowledgeable to testify on the United States' behalf with respect to the subject matters set forth in attached **Exhibit A**. A request to produce documents permitted under Rule 30(b)(2) is attached as **Exhibit B**.

## DEFINITIONS

The following definitions apply to this Deposition Notice and attached Exhibits.

**Naval School**. The Naval School refers to Naval School Explosive Ordnance Disposal at Eglin Air Force Base in Florida.

**Range at Issue**. The term "Range at Issue" means the Range C-52N as identified by the document page bates stamped by the Government as USN-3090.

**Safe Area at Issue.** The term "Safe Area at Issue" means the area identified as the "Accident Site" on the document page bates stamped by the Government as USN-3090 and USN-3091.

**Communication.** The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

**Document.** The term "document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a). A draft of a nonidentical copy is a separate document within the meaning of this term.

**Identify** (With Respect to Persons). When referring to a person, to "identify" means to give, to the extent known, the person's full name, present or last known address, e-mail address, and telephone number, and when referring to a natural person, additionally, the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

**Identify** (With Respect to Documents). When referring to documents, "to identify" means to give, to the extent known, the (i) type of document; (ii) general subject matter; (iii) date of the

document; and (iv) author(s), addressee(s), and recipient(s). If the document is a publication, please include the publication name, publisher, and section, portion, page or pages of the publication, or any other information necessary for Parties to procure a copy.

**Parties.** The terms "plaintiff" and "defendant" as well as a party's full or abbreviated name or pronoun referring to a party mean the party and, where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates. This definition is not intended to impose a discovery obligation on any person who is not a party to the litigation.

**Person.** The term "person" is defined as any natural person or business, legal or governmental entity or association.

**Concerning.** The term "concerning" means relating to, referring to, describing, evidencing, or constituting.

Respectfully Submitted,

/s/ Tom Jacob
JAMAL ALSAFAR
    jalsaffar@nationaltriallaw.com
    Texas State Bar #24027193
TOM JACOB
    tjacob@nationaltriallaw.com
    Texas State Bar #24069981

WHITEHURST, HARKNESS,
   BREES, CHENG, ALSAFFAR,
   HIGGINBOTHAM, & JACOB
   P.L.L.C.
1114 Lost Creek Blvd, Ste. 410
Austin, TX 78746
(512) 476-4346 (o)
(512) 467-4400 (f)


B. SHANNON SAUNDERS
   ssaunders@saunderslawfirm.com
   Florida State Bar #178233
Camerin J. Dixon-Hatcher
   chatcher@saunderslawfirm.com
   Florida State Bar #1025111
B. Shannon Saunders, P.A.
4359 Lafayette Street
P.O. Box 5896
Marianna, Florida 32447
(850) 526-5535 (o)
(850) 526-5586 (f)

Attorneys for the Plaintiffs


# CERTIFICATE OF SERVICE

By our signature above, we certify that a copy of this pleading has been sent on September 18, 2023, via email, per the stipulation of the parties.

# EXHIBIT A

Examination is requested on the following subject matter areas:

1.  Differences between the Rule 34(a)(2) inspection to be conducted on October 28, 2023, and the Safe Area at Issue and Range at Issue as they existed on September 10, 2021. This topic includes the briefings or other instructions provided in the inspection compared to briefings or instructions provided to Mr. Fabozzi on any date.

2.  Periodic clearance of explosives or munitions in the Safe Area at Issue at the Naval School. This topic includes identification of documentation or record keeping of such clearance, as they existed on September 10, 2021, and presently.

3.  Policies, procedures, standard operating procedures, instructions, or other rules, regulations, or standards concerning periodic or non-periodic clearance of explosives or munitions at the Naval School, as they existed on September 10, 2021, and presently. This topic includes discussion of the application of these policies to the Government and third parties.

4.  Hazard Control Briefing or safety preps at the Naval School, including the identity of documentation, record keeping, or logging of such briefing, as they existed on September 10, 2021, and presently.

5.  Policies, procedures, standard operating procedures, instructions, or other rules, regulations, or

standards concerning periodic or non-periodic Hazard Control Briefing (or other safety prep) at the Naval School, including the identity of documentation, record keeping, or logging of such briefing, as they existed on September 10, 2021, and presently. This topic includes discussion of the application of these policies to the Government and third parties.

6.   History of Material Potentially Possessing Explosive Hazards and certification of Material Hazard Deemed Safe at the Naval School during the time in which Mr. Fabozzi worked at the Naval School, including the identity of logs or record keeping of such certification.

7.   Policies, procedures, standard operating procedures, instructions, or other rules, regulations, or standards concerning History of Material Potentially Possessing Explosive Hazards and certification of Material Hazard Deemed Safe at the Naval School, including any logging or record keeping of such certifications, as they existed on September 10, 2021, and presently. This topic includes discussion of the application of these policies to the Government and third parties.

8.   Policies, procedures, standard operating procedures, instructions, or other rules, regulations, or standards concerning the Net Explosive Weight for the Ranges at the Naval School. This includes any limitations set either by written or unwritten policy, procedure, instruction, or custom, as they existed on September 10, 2021, and presently. This topic includes discussion of the application of these policies to the Government and third parties.

9.   The identity and actions of the Range Control Office and any Range Control Officer at the Naval School during the five (5) years preceding the explosion at issue in this lawsuit.

10.   The Government's policies, procedures, protocols, and practices regarding safety and security of explosives at the Naval School for Explosive Ordnance Disposal, including storage, inventory, tracking, monitoring access, and protocols for unsecured explosives, generally and as applied to the lawsuit at issue, as they existed on September 10, 2021, and presently. This topic includes discussion of the application of these policies to the Government and third parties.

11.   The government's policies, procedures, protocols, and practices regarding training of employees, contractors, and students on safety protocols and identifying and handling any material found at the Range at Issue or Safe Area at Issue, as they existed on September 10, 2021, and presently. This topic includes discussion of the application of these policies to the Government and third parties. This topic further includes any mishap investigation following a mishap occurring because of such found material.

12.   Oversight and supervision of contractors, including Plaintiff Wayne Fabozzi, working at the Naval School, including their duties, training, and monitoring while on premises, as they existed on September 10, 2021, and presently.

13.   The government's knowledge prior to September
      10, 2021, regarding any hazards, safety issues, or
      dangers regarding unexploded ordnance in the des-
      ignated safe zones or operational bunkers, includ-
      ing the Range at Issue and the Safe Zone at Issue.
      This topic also includes any mitigation efforts the
      Government may or may not have taken regarding
      these areas.

# EXHIBIT B

Under Fed. R. Civ. P. 34(b)(2), you are commanded to attend and testify at the above specified time and place; you are commanded to produce the below designated documents, electronically stored information, or tangible things in your possession, custody, or control. The following requests do not seek any communication to or from your legal counsel. Please produce a true and correct copy of the following within thirty (30) days of this notice or at the deposition, whichever is sooner. If produced before the deposition date, please produce these documents electronically. If produced at the deposition, please produce a physical copy of the document for examination and marking as a deposition exhibit, as well as an electronic version of the document in its native format.

1. Your current curriculum vitae or resume.

2. Documents you reviewed in preparation for this deposition.

3. Policies, procedures, practices, checklists, or protocols concerning the topics covered in Exhibit A, if not previously produced by the Government.

4. Reports, notes, logs, letters, communication, or other documents you have authored or have been sent to you concerning this case or the topics covered in Exhibit A.

EXH – 5
Dec 06 2023

**DEPARTMENT OF THE NAVY**
NAVAL SCHOOL EXPLOSIVE ORDNANCE DISPOSAL
8840 RANGE ROAD
NICEVILLE, FLORIDA 32578-8729

NAVSCOLEODINST 8027.1B
ESO
14 Nov 23

NAVSCOLEOD INSTRUCTION 8027.1B

From:  Commanding Officer, Naval School Explosive Ordnance Disposal

Subj:  UNEXPLODED ORDNANCE REPORTING AND ACTIONS

Ref:   (a) EAFBI 13-212 Range Planning and Operations
       (b) AFI 10-2501 Air Force Emergency Management Program Planning and Operations
       (c) AFI 31-101 Integrated Defense
       (d) NOSSAINST 8023.11D Department of the Navy Standard Operating Procedures
       Development, Implementation, and Maintenance for Ammunition and Explosives
       (e) HQ AFSEC/SEWC Memorandum of 26 January 2018, Subject: Explosives Safety
       Submission, Amendment 2, Munitions and Explosives of Concern Construction Support
       for Explosive Ordnance Disposal School, Training Area D-51 at Eglin AFB, FL

Encl:  (1) NAVSCOLEOD Suspect UXO Reporting and Actions Process Flowchart for
           Working Hours
       (2) NAVSCOLEOD Suspect UXO Reporting and Actions Process Flowchart for
           Non-working Hours
       (3) NAVSCOLEOD Suspect UXO Reporting and Actions Worksheet

1.  Purpose.  To provide policy and guidance for Unexploded Ordnance (UXO) reporting and
actions in accordance with references (a) through (c) and enclosures (1) through (3).

2.  Cancellation.  NAVSCOLEODINST 8027.1A.

3.  Scope and Applicability.  This instruction applies to all Naval School Explosive Ordnance
Disposal (NAVSCOLEOD) personnel and provides policy and guidance for UXO reporting and
actions.

4.  Background.  NAVSCOLEOD created a Standard Operating Procedure (SOP) to provide
policy and guidance in regards to suspect UXO's found on NAVSCOLEOD property.  In
accordance with reference (d), an SOP for UXO reporting and actions is not required based on
the fact we are not conducting operations involving ammunition or explosives, we are simply
reporting and outlining actions required when a UXO is found.

5.  Responsibilities.  Step by step procedures, safety precautions, reporting procedures, and
actions required when a UXO is found on NAVSCOLEOD property are as follows:

NAVSCOLEODINST 8027.1B
14 Nov 23

   a.  <u>Commanding Officer or Executive Officer</u>

      (1) Retains on-scene authority until the Incident Commander arrives.

      (2) If required, gives the order to evacuate.

   b.  <u>Explosives Safety Officer (ESO)</u>

      (1) Provides oversight on the explosives safety aspects of munitions responses occurring within NAVSCOLEOD's Area of Responsibility (AOR).

      (2) Maintains a database of UXO incidents within NAVSCOLEOD's AOR.  This is accomplished by acquiring the pertinent information and maintaining a UXO tracking database.

      (3) Acts as the primary point of contact for all UXO incidents within NAVSCOLEOD's AOR during working hours.

      (4) Responds to reported suspect UXO and utilizes enclosures (1) and (3) during working hours.

      (5) Collects and records completed enclosure (3) from the Command Duty Officer or other responsible personnel in all cases of suspect UXO reporting for non-working hours.

   c.  <u>Range Operations Manager or Training Support Department (TSD)</u>.  Acts as the primary point of contact for all UXO incidents within NAVSCOLEOD's AOR during working hours if ESO is unavailable.

   d.  <u>Command Duty Officer</u>

      (1) Acts as the primary point of contact for all UXO incidents within NAVSCOLEOD's AOR during non-working hours.

      (2) Responds to reported suspect UXO and utilizes enclosures (2) and (3) during non-working hours.

      (3) Ensures ESO receives completed enclosure (3) and any additional pertinent information in regards to UXO incident.

   e.  <u>Department Heads</u>.  If the order to evacuate is given, the Department Heads must receive evacuation reports from Division Officers/Non-Commissioned Officers In Charge (NCOIC) and report status to ESO.

NAVSCOLEODINST 8027.1B
14 Nov 23

    f.  Division Officers/NCOICs.  If the order to evacuate is given Division Officers/NCOICs must:

        (1)  Account for all personnel (staff and students) assigned to their division.

        (2)  Report evacuation status to their Department Head, upon completion of evacuation of all division personnel.

    g.  NAVSCOLEOD staff and students upon discovery of suspect UXO

        (1)  Do not touch, move, or pick up any suspect UXO items found.

        (2)  During working hours utilize enclosure (1).

        (3)  During non-working hours utilize enclosure (2).

6.  Records Management.   Records created as a result of this instruction, regardless of media and format, must be managed per Secretary of the Navy Manual 5210.1 of January 2012.

7.  Review and Effective Date.  Per OPNAVINST 5215.17A, NAVSCOLEOD (TSD) will review this instruction annually around the anniversary of its issuance date to ensure applicability, currency, and consistency with Federal, Department of Defense, Secretary of the Navy, and Navy policy and statutory authority using OPNAV 5215/40 Review of Instruction. This instruction will be in effect for 10 years, unless revised or cancelled in the interim, and will be reissued by the 10-year anniversary date if it is still required, unless it meets one of the exceptions in OPNAVINST 5215.17A, paragraph 9.  Otherwise, if the instruction is no longer required, it will be processed for cancellation as soon as the need for cancellation is known following the guidance in OPNAV Manual 5215.1 of May 2016.

                            S. G. BEALL

Releasability and distribution:
This instruction is cleared for public release and is available only via the command drive:
EGLZ\NAVSCOLEOD\Common\Instructions & Notices\8000-8999 ORDNANCE MATERIAL

NAVSCOLEOD SUSPECT UXO REPORTING AND ACTIONS
PROCESS FLOWCHART FOR WORKING HOURS



## NAVSCOLEOD SUSPECT UXO REPORTING AND ACTIONS PROCESS FLOWCHART FOR NON-WORKING HOURS



NAVSCOLEODINST 8027.1B
14 Nov 23

NAVSCOLEOD SUSPECT UXO REPORTING AND ACTIONS WORKSHEET

1.   This document will be utilized for reporting and recording of UXO incidents affecting NAVSCOLEOD.  Any additional information obtained from 96TW EOD Flight will be added to this record.  The information obtained will be maintained by the ESO for command files.

2.   Information Checklist:

   a.   Date: _____

   b.   Number of suspect UXO items: _____

   c.   Type and caliber of suspect UXO (if known): _____

   d.   Coordinates of suspect UXO: _____

   e.   Approximate location of suspect UXO on Range D-51 and nearest building number: _____

   f.   Method by which suspect UXO area is marked: _____

   g.   Name/Rank of person who determined 96TW EOD Flight assistance was needed:

   _____

   h.   Name/Rank of Person who will assist emergency responders:

   _____

   i.   Name, rank, and phone number of person making the report

   _____

3.   The following information shall be obtained from 96TW EOD Flight:

   a.   UXO Type and Caliber: _____

   b.   UXO was (circle one):  INERT          LIVE          EXPENDED/FRAG

   c.   Qty: _____

NAVSCOLEODINST 8027.1B
14 Nov 23

4.   Chronological timeline of events:

Time                          Event        Description

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

SAMPLE