1           IN THE UNITED STATES DISTRICT COURT FOR

2              THE NORTHERN DISTRICT OF FLORIDA

3                    PENSACOLA DIVISION

4     _____

5     WAYNE FABOZZI and

6     WENDY FABOZZ,

7            Plaintiffs,

8        vs.                        Case No.:

9     UNITED STATES OF AMERICA,        3:23-CV-10474-TKW-HTC

10           Defendants.

11    _____

12              VIDEOTAPED 30(b)(6) DEPOSITION

13    _____

14

15    WITNESS:          ROBERT WIMMER

16    DATE:             Thursday, December 7, 2023

17    START TIME:       11:30 a.m., ET

18    END TIME:          2:25 p.m., ET

19    REMOTE LOCATION:  Remote Legal platform

20    REPORTER:         Skyler Daniels, CER-1973

21    JOB NO.:          21416

22

23

24

25

1    Exhibit 1 to your deposition.

2         We'll go through that so we understand exactly

3    what you are designated.

4         First, do you see the plaintiff's notice of

5    deposition on your screen?

6    A    Yes, sir.

7         MR. JACOB:  Okay.  I'm going to mark as

8    Exhibit 1 this notice.

9    (Exhibit 1 marked for identification.)

10   BY MR. JACOB:

11   Q    And I will take you to -- do you see topic 1

12   of -- on page 6 of Exhibit 1 on your screen?

13   A    Yes, sir.

14   Q    Are you able to read that clearly?

15   A    Yes, sir.

16   Q    Okay.  Do you -- you understand you have been

17   designated as a representative of the United States of

18   America on topic 1 as it relates to the physical

19   structures?

20   A    Yes, sir.

21   Q    Okay.  And then I'll take you to page 7 of

22   Exhibit 1.  Do you see topic 6 on your screen?

23   A    Yes, sir.

24   Q    Do you understand that you've been designated

25   as a representative of the United States of America as

1    it concerns topic 6 as it relates to the Naval School?

2        A    Yes, sir.

3        Q    And then I will take you to page 9 of Exhibit

4    1.  Do you see page 9 of Exhibit 1 with topic --

5        A    Yeah.

6        Q    -- 13?

7        A    Yes, sir.

8        Q    And do you understand you have been designated

9    as a witness -- a representative of the United States of

10   America concerning topic 13 on Exhibit 1?

11       A    Yes, sir.

12       Q    Okay.  Can you tell me what is your general

13   understanding of your responsibility concerning these

14   topics that you've been designated as a representative

15   on?

16       A    Basically to answer the questions and provide

17   any information based on your questioning related to the

18   associated topics to the best of my ability.

19       Q    Then that's a great understanding.

20            Do you understand to the extent that you don't

21   personally know information about the -- concerning one

22   or the other topics the government has a responsibility

23   to prepare you and provide you the relevant knowledge

24   needed to answer those questions?

25       A    Are you asking me, do I understand the

1    it into DLA or whatnot, we have to document it as safe,

2    and that's exactly what that is.

3        Q    Okay.  So -- just so I understand the

4    procedure, when you have material presenting as an

5    explosive hazard when someone believes that that

6    material may be have an explosive hazard, they have to

7    go through this process every time where they certify

8    that material as material that is deemed safe?

9        A    Yes.  It's actually documented as safe, but

10   the "deemed as safe", is -- you'll see -- you'll see the

11   MDAS.

12            Basically -- I'm struggling for a word here,

13   but you'll see it as -- written out as material deemed

14   as safe and material documented as safe depending upon

15   what instruction or reference that you're looking at,

16   but it's the same thing.

17       Q    And is there any discretion when you have

18   material that is potentially presenting an explosive

19   hazard to not follow this procedure?

20       A    If it is classified as MPPEH.  There are some

21   exceptions, but, yes, if you have something that is

22   MPPEH and it is going to be -- you know, turned over to

23   the -- you know, the -- into the -- leave -- leave the

24   custody, I guess, of -- of the United States and go to a

25   scrapper or something like that, then, yes, it has to be

1      Q    Okay.  And would you agree with me that that

2  DoD instruction sets the minimum bar?

3                MR. FISHER:  Object to form.

4                Go ahead.

5                THE WITNESS:  What's that now?

6                MR. FISHER:  You can answer.

7                THE WITNESS:  As far as the minimum

8  standard.  I -- possibly.  I mean, I know that the

9  services can -- can make policy, procedures more

10  stringent.

11  BY MR. JACOB:

12      Q    And that's --

13      A    But -- yeah.

14      Q    And that's exactly --

15      A    Yeah.

16      Q    -- what I mean.  If the Air Force of the Navy

17  wanted to, either could make a more strict policy as it

18  applies to MPPEH, so material potentially presenting an

19  explosive hazard, correct?

20      A    Yes, sir.

21      Q    Okay.  And if, you know, the Air Force or the

22  Navy created a more strict policy, you would agree that

23  the more strict policy would be applicable, correct?

24      A    Is -- if it was specifically related to the

25  situation, correct.

1       A    Correct.

2       Q    Regulations require notifying a supervisor,

3    right?

4       A    Correct.

5       Q    Regulations require on-staff (sic) evacuate

6    personnel to 357 feet or greater, correct?

7       A    Correct.

8       Q    Mark the location?

9       A    Marking the location and all that would be

10   consistent with --  with the UXO, yes.

11      Q    Okay.  And post a staff to guard that UXO,

12   right?

13      A    Right.

14      Q    Okay.  Now, what I wanted to talk to you about

15   now that we've gotten that out of the way, is actually

16   in Mr. Snider's testimony yesterday, he said that

17   between when this instruction that you see as Exhibit 11

18   on your screen was issued and when he testified, the

19   range -- the evacuation range of 357 was increased from

20   357-feet to something like 600-feet.

21           Are you aware of that change?

22      A    I -- I'm -- I'm familiar with it as -- as far

23   as I know that there has been a change.

24      Q    Okay.  Do you know why that change was made?

25      A    I'm -- I'm assuming that the ESS was updated,

1    which would change that distance.  That's what I was

2    saying.  And you have to look at the ESS to see if it's

3    specific to D-51 or -- or another range.

4        Q    All right.

5        A    That's -- that's what clued me in that the --

6    that you UXO flowchart was the intent whenever that was

7    designed and developed.  And that instruction was for

8    the -- the operations -- the training operations being

9    conducted on D-51.

10        Q    Are you aware whether there was a hazard or

11    danger that occurred on the range or on the Navy School

12    that required increasing the evacuation range?

13        A    Normally what those increased evacuation

14    distances are from is based on the largest item that has

15    been found in the history.  Whenever they do UXO calls

16    out there or whatnot.

17             So they'll base that distance on -- you know,

18    hey, the -- the largest thing that we found maybe was a

19    -- you know, 60-millimeter projectile or something like

20    that.

21             And then if they have another call or another

22    survey and they find something larger, then they will

23    update those distances.

24             And I do -- excuse me, I do believe that is

25    the reason that those distances may have changed, but I

1    identify, you know, similarities or differences between

2    the actual physical property that was on this range

3    between our inspection and September 10th, 2021.

4           Do you understand that?

5       A    I do understand that.  And let me -- let me go

6    back for other purposes -- and I don't have the dates.

7    Trying to work with CE and whatnot to get mowing

8    contracts and things like that, you know, I did go out

9    to 52 West and 52 North and do site surveys with

10   personnel and stuff like that.

11          But my best recollection is anything

12   associated with this incident I haven't been out there

13   since, like I said, October 28th.

14          And I've been out there multiple times, just

15   don't remember if it was, you know, in 2021, 2020, you

16   know.  Or how many times in '21 just off the top of my

17   head.  I just don't recall those facts.

18      Q    As you sit here today as a representative of

19   the United States of America, are you prepared to

20   discuss, sort of, the similarities or differences in

21   this range area reflected in Exhibit 8 between our

22   inspection in October 2023, and when this incident

23   occurred in September 10th, 2021?

24      A    Absolutely.  Yes.

25      Q    Okay.  Let me start with the operational

1    control bunker in 2021.  Was that bunker operational in

2    any -- in all fashions?

3         A    Yes, sir.  Yes.  It was -- you know, basically

4    I mean, there's certain things in there that may not

5    work, you know, work orders have to be put in, things

6    like that, but for all intents and purposes, it was

7    being used in 2021.

8         Q    Sure.  And what I mean by that, in 2021 did

9    the doors work?  You could open and close them

10   correctly?

11        A    Yes, sir.

12        Q    In 2021 did it serve its protective function

13   in terms of protecting the individuals inside the bunker

14   from explosive hazards outside of the bunker?

15        A    Yes, sir.

16        Q    And I'll show you that exhibit again.  You

17   remember the marked area that was listed as the boundary

18   for the dedicated impact range?

19        A    Yes, sir.

20        Q    How far away from the operational control

21   bunker is that boundary?

22        A    The boundary itself?  I know one of the

23   closest targets within that area is right at about 1,900

24   feet away from the OCB.

25             And that is if you look -- kind of, the dirt

1    Range Road 200 and just down, it's still asphalt, just

2    covered with a little dirt.

3        A    Okay.

4        Q    And you're looking southward, right.  From --

5        A    Okay.

6        Q    -- the operational control bunker.  And so

7    what I wanted to ask you about the photo in Exhibit 16,

8    is, was it -- in 2021 was it usual to see tire tracks

9    like this going off Range Road 200 south towards the

10   dedicated impact area boundary?

11              MR. FISHER:  Object to form.

12              THE WITNESS:  There are other units that

13   train out there, like the Special -- 7th Special Forces

14   Group.  There are RT&T EOD contractors that, you know,

15   drive across range for target maintenance and things

16   like that.

17              So to see tracks going off the road into

18   those areas is not uncommon.

19   BY MR. JACOB:

20       Q    So it's not surprising to you to see tracks --

21       A    No.

22       Q    -- going off range road south from the OCB?

23       A    No.  It is not.

24       Q    Okay.  Is that area, I guess, between the OCB

25   and the dedicated -- the boundary that we had discussed

1    earlier, is that a highly trafficked area?

2        A    As far as, like, the field and whatnot itself?

3        Q    Yeah.

4        A    I can't speak for the extent of the Special --

5    the 7th Special Forces Group training that they conduct

6    out there.

7            But if you remember from the site survey, you

8    did see targets, silhouettes, personnel, vehicles-type

9    thing.  So I can't speak to how far they would drive out

10   there or whatnot, or is that just somebody backing up

11   and -- and doing a three-point turn?  You know what I'm

12   saying?  I can't speculate to that.

13           But it would not surprise me that, yes, in

14   order to get those targets out there and to maintain

15   those targets that they're going to have to drive across

16   that.

17       Q    Right.  And if you zoom in to this photo it

18   doesn't look like it's just a backing out.  It looks --

19       A    Right.

20       Q    -- like it continues --

21       A    Sure.

22       Q    -- forward.  Right?

23       A    Yeah.  It doesn't surprise me.

24       Q    So is it fair to say that in -- people do

25   regularly travel south of Range Road 200 to work on --

1    in the field or address those targets as you had been

2    talking about?

3         A    Yes, sir.

4              MR. FISHER:  Object to form.

5    BY MR. JACOB:

6         Q    And I want to -- that's a good transition

7    because I did want to ask you about those -- the

8    targets.

9              How many targets are there south of Range Road

10   200 in --

11        A    I --

12        Q    -- that operational control bunker area?

13        A    I don't have the specifics on that only --

14   only because it's not, you know, part of the Navy

15   operation.

16        Q    Okay.  In your experience going out there, is

17   it more than 5?  Ten?

18        A    Well, I do remember a picture that I had taken

19   from an old Elgin range map of those targets in that

20   area.  And I want to say there was over -- probably at

21   least -- I don't know, five or eight targets that I

22   noticed on 5 -- 52 North.

23             Probably somewhere between 5 and 10 targets

24   that they -- that actually get shot at.  You know what

25   I'm saying?  From gunships or strafing or something like

1     Q    Again, another sign that says something like

2  warning, that's laying in the grass.

3     A    Yes.  I see it.

4     Q    Okay.  And so what I wanted to ask you, is

5  these -- these signs on or before September 20, 2021,

6  were these signs in the same condition?

7     A    I cannot speak to that.  Like I said, those

8  are not signs associated with our operation on C-52

9  North.

10          So, like I said, I don't know if they're

11  associated with 7th or some other tests or what they

12  are, but they're not anything that looks familiar to me.

13     Q    Okay.  Well, as the representative of the

14  government on how -- you know, the physical attributes

15  of this area in September 20, 2021, do you have any

16  evidence to believe that these signs were up, or they

17  were, you know, posted somewhere, or they were in any

18  situation other than how they were -- they are depicted

19  in Exhibits 20 and 21?

20     A    I -- I do not have any evidence that can say

21  one way or the other.

22     Q    Okay.  And then I'll back out and I want to

23  talk about, sort of, signs in general --

24     A    Yes.

25     Q    -- in that operational control bunker area or

1  anywhere that Mr. Fabozzi was stationed on or before

2  September 10, 2021, were there signs instructing people

3  not to pick anything up?

4      A    No.  There's signs on the range perimeter and

5  everything that basically talks about -- you know,

6  warning people that this is a -- an area that has

7  explosive operations.

8          There's no fence lines in a lot of these

9  ranges or whatnot.  I mean, the signs would be posted on

10 trees and stuff like that.  Talk about closed area,

11 explosive operations area.

12         But to the best of my knowledge right there at

13 the OCB, I'm not familiar with any specific signs in

14 that immediate area.

15     Q    And that's what I was -- you know, asking

16 about was that area in the -- around the operational

17 control bunker where Mr. Fabozzi was stationed, were

18 there any signs instructing people, you know, not to

19 pick up anything?

20     A    Not -- not to my knowledge.

21     Q    On -- or September 10th, 2021, in the OCB area

22 and that surrounding area where Mr. Fabozzi was

23 stationed were there signs that people -- that that area

24 was cleared of UXOs or other explosives?

25     A    No.  That -- there's no signs.  But it's kind

1    of out of the norm that they would be there anyway.

2    It's not a standard practice.

3        Q    Well, let me ask you this, on or before

4    September 10, 2021, what signs, or postings, or boards,

5    or anything were in that OCB area or that surrounding,

6    you know, area where Mr. Fabozzi was stationed?

7        A    No signage that I'm aware of in the immediate

8    vicinity of OCB.

9        Q    Okay.

10                MR. JACOB:  So let me -- let's actually

11   go off the record again.  Now we've gone more than

12   several hours without taking a break.

13                I'm going to insist that we take a break.

14                THE WITNESS:  That's --

15                MR. JACOB:  I did promise we would take

16   one every hour and we have not done that.  Even if you

17   say no, I'm insisting we take a break.

18                THE WITNESS:  Okay.

19                MR. JACOB:  Okay.

20                THE WITNESS:  Appreciate it.  Thank you.

21                MR. JACOB:  Okay.  Thank you.

22                THE REPORTER:  All right.  We are going

23   off the record at 2:12 p.m. Eastern Standard Time.

24        (Off the record.)

25                THE REPORTER:  Back on the record.  2:22

1                    CERTIFICATE OF REPORTER

2

3

4   I, Skyler Daniels, Digital Reporter certify:

5            That the foregoing proceedings were taken

6   before me at the time and place therein set forth, at

7   which time the witness was put under oath by me;

8            That the testimony of the witness and all

9   objections made at the time of the examination were

10  electronically recorded by me and thereafter

11  transcribed;

12           That the foregoing is a true and correct

13  transcript of my electronic recording;

14           And I further certify that I am not a relative

15  or employee of any attorney, or of any party, nor

16  financially interested in the action.

17

18           DATED this 27th day of December 2023.

19

20               __/s/ Skyler Daniels_____

21               Skyler Daniels, CER-1973,

22               Certified Digital Reporter

23

24

25

# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA PENSACOLA DIVISION

**WAYNE FABOZZI** and
**WENDY FABOZZI**,

      Plaintiffs

vs.

**UNITED STATES OF AMERICA**,

      Defendant

**NO.
3:23-CV-10474-TKW-HTC**

## PLAINTIFFS' NOTICE OF DEPOSITION

To:  Defendant, United States of America, through its Attorneys of record.

Please take notice that under Fed. R. Civ. P. 30(b)(6), the above Plaintiffs will take the deposition of the Defendant, United States of America, by oral examination using video, audio, and stenographic means, at the following location and date:

Date and Time:  Dec. 5 (9am CST); 6 (10am CST); 7 (10am CST & 1pm CST), 2023

Location:  4359 Lafayette Street, Marianna, Florida 32446.

Court Reporter:  Remote Legal or designee

Videographer:  Remote Legal or designee

Page 1 of 10

The deposition will continue from day to day until completed, with such breaks, as necessary. Pursuant to Rule 30(b)(6), the United States of America shall designate one or more officers, directors, managing agents, or other persons who consent and are knowledgeable to testify on the United States' behalf with respect to the subject matters set forth in attached **Exhibit A**. A request to produce documents permitted under Rule 30(b)(2) is attached as **Exhibit B**.

## DEFINITIONS

The following definitions apply to this Deposition Notice and attached Exhibits.

**Naval School**. The Naval School refers to Naval School Explosive Ordnance Disposal at Eglin Air Force Base in Florida.

**Range at Issue**. The term "Range at Issue" means the Range C-52N as identified by the document page bates stamped by the Government as USN-3090.

**Safe Area at Issue.** The term "Safe Area at Issue" means the area identified as the "Accident Site" on the document page bates stamped by the Government as USN-3090 and USN-3091.

**Communication.** The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

**Document.** The term "document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a). A draft of a nonidentical copy is a separate document within the meaning of this term.

**Identify** (With Respect to Persons). When referring to a person, to "identify" means to give, to the extent known, the person's full name, present or last known address, e-mail address, and telephone number, and when referring to a natural person, additionally, the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

**Identify** (With Respect to Documents). When referring to documents, "to identify" means to give, to the extent known, the (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s), and recipient(s). If the document is a publication, please include the publication name,

publisher, and section, portion, page or pages of the publication, or any other information necessary for Parties to procure a copy.

**Parties.** The terms "plaintiff" and "defendant" as well as a party's full or abbreviated name or pronoun referring to a party mean the party and, where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates. This definition is not intended to impose a discovery obligation on any person who is not a party to the litigation.

**Person.** The term "person" is defined as any natural person or business, legal or governmental entity or association.

**Concerning.** The term "concerning" means relating to, referring to, describing, evidencing, or constituting.

Respectfully Submitted,

/s/ Tom Jacob
JAMAL ALSAFAR
    jalsaffar@nationaltriallaw.com
    Texas State Bar #24027193
TOM JACOB
    tjacob@nationaltriallaw.com
    Texas State Bar #24069981
WHITEHURST, HARKNESS,
    BREES, CHENG, ALSAFFAR,
    HIGGINBOTHAM, & JACOB
    P.L.L.C.

1114 Lost Creek Blvd, Ste. 410
Austin, TX 78746
(512) 476-4346 (o)
(512) 467-4400 (f)


B. SHANNON SAUNDERS
   ssaunders@saunderslawfirm.com
   Florida State Bar #178233
Camerin J. Dixon-Hatcher
   chatcher@saunderslawfirm.com
   Florida State Bar #1025111
B. Shannon Saunders, P.A.
4359 Lafayette Street
P.O. Box 5896
Marianna, Florida 32447
(850) 526-5535 (o)
(850) 526-5586 (f)

Attorneys for the Plaintiffs


# CERTIFICATE OF SERVICE

By our signature above, we certify that a copy of this pleading has been sent on September 18, 2023, via email, per the stipulation of the parties.

# EXHIBIT A

Examination is requested on the following subject matter areas:

1. Differences between the Rule 34(a)(2) inspection to be conducted on October 28, 2023, and the Safe Area at Issue and Range at Issue as they existed on September 10, 2021. This topic includes the briefings or other instructions provided in the inspection compared to briefings or instructions provided to Mr. Fabozzi on any date.

2. Periodic clearance of explosives or munitions in the Safe Area at Issue at the Naval School. This topic includes identification of documentation or record keeping of such clearance, as they existed on September 10, 2021, and presently.

3. Policies, procedures, standard operating procedures, instructions, or other rules, regulations, or standards concerning periodic or non-periodic clearance of explosives or munitions at the Naval School, as they existed on September 10, 2021, and presently. This topic includes discussion of the application of these policies to the Government and third parties.

4. Hazard Control Briefing or safety preps at the Naval School, including the identity of documentation, record keeping, or logging of such briefing, as they existed on September 10, 2021, and presently.

5. Policies, procedures, standard operating procedures, instructions, or other rules, regulations, or

standards concerning periodic or non-periodic Haz-
ard Control Briefing (or other safety prep) at the
Naval School, including the identity of documenta-
tion, record keeping, or logging of such briefing, as
they existed on September 10, 2021, and presently.
This topic includes discussion of the application of
these policies to the Government and third parties.

6.   History of Material Potentially Possessing Explo-
sive Hazards and certification of Material Hazard
Deemed Safe at the Naval School during the time
in which Mr. Fabozzi worked at the Naval School,
including the identity of logs or record keeping of
such certification.

7.   Policies, procedures, standard operating proce-
dures, instructions, or other rules, regulations, or
standards concerning History of Material Poten-
tially Possessing Explosive Hazards and certifica-
tion of Material Hazard Deemed Safe at the Naval
School, including any logging or record keeping of
such certifications, as they existed on September
10, 2021, and presently. This topic includes discus-
sion of the application of these policies to the Gov-
ernment and third parties.

8.   Policies, procedures, standard operating proce-
dures, instructions, or other rules, regulations, or
standards concerning the Net Explosive Weight for
the Ranges at the Naval School. This includes any
limitations set either by written or unwritten pol-
icy, procedure, instruction, or custom, as they ex-
isted on September 10, 2021, and presently. This
topic includes discussion of the application of these
policies to the Government and third parties.

9.     The identity and actions of the Range Control Of-
       fice and any Range Control Officer at the Naval
       School during the five (5) years preceding the ex-
       plosion at issue in this lawsuit.

10.    The Government's policies, procedures, protocols,
       and practices regarding safety and security of ex-
       plosives at the Naval School for Explosive Ord-
       nance Disposal, including storage, inventory,
       tracking, monitoring access, and protocols for un-
       secured explosives, generally and as applied to the
       lawsuit at issue, as they existed on September 10,
       2021, and presently. This topic includes discussion
       of the application of these policies to the Govern-
       ment and third parties.

11.    The government's policies, procedures, protocols,
       and practices regarding training of employees, con-
       tractors, and students on safety protocols and iden-
       tifying and handling any material found at the
       Range at Issue or Safe Area at Issue, as they ex-
       isted on September 10, 2021, and presently. This
       topic includes discussion of the application of these
       policies to the Government and third parties. This
       topic further includes any mishap investigation fol-
       lowing a mishap occurring because of such found
       material.

12.    Oversight and supervision of contractors, including
       Plaintiff Wayne Fabozzi, working at the Naval
       School, including their duties, training, and moni-
       toring while on premises, as they existed on Sep-
       tember 10, 2021, and presently.

13.   The government's knowledge prior to September 10, 2021, regarding any hazards, safety issues, or dangers regarding unexploded ordnance in the designated safe zones or operational bunkers, including the Range at Issue and the Safe Zone at Issue. This topic also includes any mitigation efforts the Government may or may not have taken regarding these areas.

## EXHIBIT B

Under Fed. R. Civ. P. 34(b)(2), you are commanded to attend and testify at the above specified time and place; you are commanded to produce the below designated documents, electronically stored information, or tangible things in your possession, custody, or control. The following requests do not seek any communication to or from your legal counsel. Please produce a true and correct copy of the following within thirty (30) days of this notice or at the deposition, whichever is sooner. If produced before the deposition date, please produce these documents electronically. If produced at the deposition, please produce a physical copy of the document for examination and marking as a deposition exhibit, as well as an electronic version of the document in its native format.

1. Your current curriculum vitae or resume.

2. Documents you reviewed in preparation for this deposition.

3. Policies, procedures, practices, checklists, or protocols concerning the topics covered in Exhibit A, if not previously produced by the Government.

4. Reports, notes, logs, letters, communication, or other documents you have authored or have been sent to you concerning this case or the topics covered in Exhibit A.