# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA PENSACOLA DIVISION

**WAYNE FABOZZI** and
**WENDY FABOZZI**,

       Plaintiffs

vs.

**UNITED STATES OF AMERICA**,

       Defendant

**NO.
3:23-CV-10474-TKW-HTC**

## PLAINTIFFS' RESPONSE TO THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

At least since the 1960s, the Government's negligence has put Floridians in the path of explosives. They've turned to the FTCA for accountability.[1] In fact, Floridians harmed by these, and other ultra-hazardous activities, look to the FTCA for remedies.[2]

---

[1]  *Brown v. United States*, 193 F.Supp. 692, 692–93 (N.D.Fla. 1961) (employee of Government contractor injured when it provided contractor a live bomb).

[2]  *Stevens v. Battelle Mem'l Inst.*, 561 F.3d 1200, 1201–02 (11th Cir. 2009) (United States owes a heightened duty of care when working with anthrax); *H.L. Properties, Inc. v. Aerojet-General Corp.*, 331 F.Supp. 1006, 1009 (S.D.Fla. 1971) (Government has duty to prevent harm when test firing rockets). Florida is not an island unto itself: *Aretz v. United States*, 604 F.2d 417, 420 (5th Cir. 1979) (building

This case is no different. It exposes the Government's decades-long failure to follow its own rules with explosive materials. Ten years ago, their negligence put a missile in civilian hands.[3] Luckily, it was inert.[4]

Now, they've done it again. Given this history, what happened here was inevitable. As Commander Beall stated: "I do find that we as an organization **grossly violated** established procedures and fostered a culture of systemic deviation from the norms which in turn became normal operations."[5] The problem had persisted for decades: "'This is the way we have always done it' was the consistent theme and over time what right looks like in accordance with policy became lost."[6]

---

explosion where it manufactured flares, killing fifty people and injuring twenty-nine others); *Toole v. United States*, 588 F.2d 403, 408–09 (3d Cir. 1978) (U.S. liable under failure-to-warn theory for the death of an independent contractor engaged in the manufacture of ultra hazardous anti-tank explosives); *Duvall v. United States*, 312 F. Supp. 625, 626, 630 (E.D.N.C. 1970) (Navy liable for failure to secure bombs on range causing civilian to lose arm) (citing cases).

[3] ECF-50-28, USN-17759–67.

[4] *Id.*

[5] ECF-50-20, USN-13798 (emphasis added).

[6] *Id.*

The Navy handed an explosive to an untrained civilian—knowing it wasn't inert. They broke every rule, instruction, and shred of common sense about handling explosives. Two minutes later, it exploded in Wayne Fabozzi's hands. He lost his left arm, several fingers, and suffered a traumatic brain injury.

The Court should deny the Government's motion. There are fact questions throughout, and no FTCA exception shields the Government.

## TABLE OF CONTENTS

Legal Backdrop ................................................................... 5

  1. The FTCA .................................................................. 5

  2. Regulations ............................................................... 6

  3. Rule 30(b)(6) Testimony ........................................... 7

Wrongful Acts & Omissions ........................................... 8

  1. Government employees encouraged gathering range debris. ................................................................... 9

  2. The Government never cleared the areas they called safe. ...................................................................... 12

    2.1. Parties dispute the reason for the safe area. ............... 14

    2.2. The Government disputes the meaning of the word "all." ..................................................................... 15

2.3. The Government argues an explosive on the
surface is actually "subsurface." ................................... 17

3. The Government's lack of safety briefs reinforced its
negligent conduct. ................................................. 19

4. A Navy instructor knew he had an explosive yet gave it
to a civilian. ...................................................... 22

Discretionary Function.................................................. 27

1. Mandatory Obligation ......................................... 28

2. Policy-Making Decision ....................................... 31

Misrepresentation ...................................................... 32

1. Plaintiffs complain of the daily operation of the
Government...................................................... 33

2. Plaintiffs don't allege a misrepresentation cause of
action. ........................................................... 36

3. Plaintiffs don't complain of commercial decisions. .............. 38

Causes of Action ....................................................... 40

1. Ultrahazardous Activities .................................... 40

2. Premises Liability ............................................. 41

Conclusion .............................................................. 44

# LEGAL BACKDROP

The Government files both a 12(b)(6) and summary judgment motion, relying on a factual attack.[7] Given this, the Court should apply a Rule 56 standard.[8]

## 1. *The FTCA*

The FTCA is a "broad waiver of sovereign immunity" for the wrongful acts or omissions of the United States.[9] And its exceptions shouldn't be liberally interpreted in favor of the United States.[10]

The Government, citing unpublished dicta, says the burden is on Plaintiffs, at least for the discretionary function exception.[11]

---

[7] ECF-41, at 31.

[8] *Lawrence v. Dunbar*, 919 F.2d 1525, 1530 (11th Cir. 1990); Fed. R. Civ. P. 56(a).

[9] *Phillips v. United States*, 956 F.2d 1071, 1074 (11th Cir. 1992).

[10] *Dolan v. United States*, 546 U.S. 481, 491–92 (2006).

[11] ECF-41, at 36 (*citing Cuarado-Conception v. United States*, 851 Fed. App'x. 985, 990 (11th Cir. 2021) ("allocation of burdens is not significant when the relevant facts are undisputed, which is the case here") (cleaned up). "Cleaned up" indicates internal changes and citations were removed for clarity. *See* Jack Metzler, Cleaning Up Quotations, 18 J. App. Prac. & Process 143 (2017), *available at* https://t.co/pTe38Whep7.

In fact, this circuit hasn't ruled on the issue.[12] But four other circuits have. They hold, at summary judgment or trial, "the burden falls on the government to prove the applicability of a specific exception to the immunity waiver."[13]

The result: to win summary judgment, the Government must conclusively prove any exceptions to the FTCA.[14]

### 2. *Regulations*

Naval School for Explosive Ordnance Disposal (EOD) sits on Eglin Air Force Base.[15] The Navy contracted with the Air Force to use Eglin Air Force Base property for the Naval School.[16]

---

[12] *See Autery v. United States*, 992 F.2d 1523, 1526 n.6 (11th Cir. 1993); *Hughes v. United States*, 110 F.3d 765, 767 n.1 (11th Cir. 1997); *contra Ochre v. United States*, 117 F.3d 495, 504 n.4 (11th Cir. 1997) (the burden of production "must be on the Government.").

[13] *Gaetano v. United States*, 994 F.3d 501, 509 (6th Cir. 2021); *Merando v. United States*, 517 F.3d 160, 164 (3d Cir. 2008); *Prescott v. United States*, 973 F.2d 696, 702 (9th Cir. 1992); *Stewart v. United States*, 199 F.2d 517, 520 (7th Cir. 1952).

[14] *See Ray Comm., Inc. v. Clear Channel Comm., Inc.*, 673 F.3d 294, 299 (4th Cir. 2012) (conclusive proof needed where movant has burden); *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 193 (5th Cir. 2013).

[15] ECF-19 ¶¶ 5.1, 6.1.

[16] ECF-50-4, USN-1784–1805.

As part of that deal, the Navy agreed to follow all DoD, Air Force, Navy, and Eglin Air Force Base rules on explosive operations and safety.[17] The deal also makes the Navy responsible for UXO clearance.[18]

Whether the Air Force or Navy breached regulations, the Plaintiffs exhausted their remedies against both. This lawsuit challenges the wrongful conduct of both agencies.[19]

### 3.   *Rule 30(b)(6) Testimony*

Plaintiffs offer the Government's Rule 30(b)(6) testimony, where the representative speaks to the Government's collective knowledge and position on the listed topics.[20]

Plaintiffs listed several topics.[21] The Government responded

---

[17]   ECF-50-4, USN-1797 ¶ 20; ECF-50-34, Chioma Dep. 122:13–20 (Same testimony from Rule 30(b)(6) representative on policies— Topics 2, 3, 6, & 7).

[18]   ECF-50-4, USN-1799–1800.

[19]   ECF-13, at 4 (Complaint); ECF-37 (Plaintiffs' MSJ); ECF-46 (Plaintiffs' MSJ granted).

[20]   *Mitnor Corp. v. Club Condos.*, 339 F.R.D. 312, 320 (N.D.Fla. 2021); *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 34 (2d Cir. 2015).

[21]   ECF-50-2, at 6–8 (Notice of Deposition).

by naming these representatives: **Robert Snider**,[22] **Col. Vincent Chioma**,[23] **Robert Wimmer**,[24] and **Timothy Andera**.[25]

## WRONGFUL ACTS & OMISSIONS

Plaintiffs' claims stem from the negligent acts or omissions of Government employees that caused the explosion on September 10, 2021. For this, Plaintiffs designated Major Peter Lawson as an expert.[26] In response, the Government hasn't designated a rebuttal expert or filed a *Daubert* motion. Why? Well, since 1982, Maj. Lawson has worked in the explosive ordnance field.[27] He's been a sheriff's deputy, a marine, a Master EOD tech, a bomb tech, and currently serves as a professor teaching explosive/UXO demolition procedures and safety.[28]

---

[22] ECF-50-37, Snider Dep. 39:12–25 (Topic 1 as the hazard control brief only); *Id.* at 40:4–8 (Topics 4, 5, 8, 9, & 11).

[23] ECF-50-34, Chioma Dep. 19:5-8 (Topics 2, 3, 6, & 7).

[24] ECF-50-39, Wimmer Dep. 14:11–20 (Topic 1 as to physical structures); *id.* at 14:21–15:2 (Topic 6 as applied to the Naval School); *id* at 15:8–11 (Topic 13).

[25] ECF-50-32, Andera Dep. 13:1–5 (Topic 12).

[26] ECF-38-1.

[27] ECF-50-1, Maj. Lawson CV.

[28] *Id.*

Broadly, the wrongful acts or omissions Maj. Lawson discovered are:

1. Government employees habitually gave Mr. Fabozzi remnants of explosive material from the range. They had him make plaques for them.

2. The Government was supposed to clear the area where the explosive was found. They didn't even try.

3. Each day, the Government was supposed to give a safety briefing, reinforcing all the rules. They didn't follow this rule either.

4. A Navy EOD instructor knew an object was a bomb. He gave it to an untrained civilian.

## 1. *Government employees encouraged gathering range debris.*

For over three years before the explosion, Navy employees gave Mr. Fabozzi materials from the range to make plaques for their "I love me" walls.[29] And the Navy instructor corroborated this testimony.[30] In two months, the instructor personally saw fifteen of these "gifts" made.[31] This was standard practice after

---

[29] ECF-50-7, USN-4285; ECF-50-38, Fabozzi Dep. 66:4–21, 65:22–66:10.

[30] ECF-50-36, Mattes Dep. 32:6–23.

[31] *Id.* at 34:9–24.

*each* detonation.[32] And everyone knew Mr. Fabozzi could help: "anybody that had worked with him knew that he went to the ranges and collected frag and made it into gifts."[33]

Mr. Basilio also confirmed this testimony.[34] He said that the instructors particularly liked when Mr. Fabozzi got them "a bomb [that] you could still see part of the band on it, that was, you know … just a nice-looking piece of frag."[35] Likewise, he confirmed this was "normal" and a "regular practice."[36] And no one said anything.[37]

Though, they should have.[38] To start, the Beall investigation found that "NAVALSCHEOD DEMO instructors [violated] policy

---

[32] *Id.* at 34:2–17.

[33] *Id.* at 47:27–48:8; ECF-50-38, Fabozzi Dep. 130:3–7; ECF-50-33, Basilio Dep. 28:22–29:2.

[34] ECF-50-33, Basilio Dep. 77:18–78:12, 30:13–31:8, 78:21–24.

[35] *Id.* at 31:15–22.

[36] *Id.* at 79:9–11, 80:23–81:5.

[37] ECF-50-36, Mattes Dep. 36:9–10, 49:8–19; ECF-50-35, Lenoir Dep. 21:1–8.

[38] Mr. Fabozzi was not reprimanded for taking walks, either. ECF-50-33, Basilio Dep. at 74:13–75:1; ECF-50-40, Young Dep. 49:11–21; ECF-50-35, Lenoir Dep. 19:13–16, 23:19–24:1; ECF-50-32, Andera Dep. 28:2–18 (Gov't rep. on topic 12—oversight of medics, they should have). Even though it was common knowledge. ECF-50-33, Basilio Dep. 28:22–29:2, ECF-50-38, Fabozzi Dep. 130:3–7.

in the past by providing Mr. Fabozzi with fragmentation from the range."[39]

That's because range debris is strictly and specifically regulated.[40] Two EOD experts must "double-inspect" and certify debris before it's cleared for public release.[41] Similarly, Navy policy says uncertified material "shall never be released to the public."[42] Likewise, it must be "inspected, reinspected and formally reclassified" before it's cleared for public release.[43] "A chain-of-custody process is required" for collection and final disposition.[44]

None of the material Navy employees gave to Mr. Fabozzi went through this mandatory process.[45] This practice encourages

---

[39] ECF-50-20, USN-13798.

[40] ECF-50-14, USN-6537 ¶ 5.2.4, USN-6485 (declaring policy mandatory); ECF-50-12, USN-4819–20 (Navy SOP); ECF-50-34, Chioma Dep. 146:4–9 (same) (Gov't Rep. on Explosive Hazards—Topic 6); ECF-50-39, Wimmer Dep. 30:3–11.

[41] ECF-50-14, USN-6537–38 ¶¶ 5.2.4.3–5.2.4.4.

[42] ECF-50-26, USN-16113–USN-16115 ¶ (4)(d) & (4)(d)(3) (Navy policy on "minimum requirements" for control of material potentially possessing explosive hazard); USN-16121 (acronym definitions).

[43] *Id.* at USN-16113–USN-16115; ECF-50-34, Chioma Dep. 146:10–13 (same).

[44] ECF-50-26, USN-16115.

[45] ECF-50-34, Chioma Dep. 151:13–17 (Gov't rep. on this issue).

civilians to collect range material.[46] OSHA asked Wayne why he picked up the debris. He said, it looked "like something I could use on a plaque."[47]

## 2.   *The Government never cleared the areas they called safe.*

DoD policy makes it a "SAFETY REQUIREMENT" to clear ranges of UXOs, but the idea of clearing the whole range is a strawman.[48] The rules don't demand clearing every inch of the base, just the small area where people go. The implementing, mandatory policy orders: "EOD Personnel will clear target access roads and the area 50 feet on either side during clearance operations or target maintenance activities."[49,50] The

---

[46]  ECF-38-1, at 10.

[47]  ECF-50-7, USN-4285:25–26.

[48]  ECF-50-22, USN-15134 ¶ 2(b) (emphasis in original).

[49]  ECF-50-14, USN-6539 ¶ 5.3.4, 5.3.4.1 ("Range Clearance Requirements"), USN-6485 (noting mandatory regulation), USN-6535 ¶ 5.1; ECF-50-34, Chioma Dep. 80:13–15, 127:9–14, 139:11–17, 152:12–153:5 (requirement to clear ranges); 138::17–139:17 (mandatory policy).

[50]  The Government argues clearance is not feasible. *Contra* ECF-50-20, USN-13797 ¶ 3(j) (in response to this incident, the Navy started clearing the road and safe area); *Compare* ECF-50-10, USN-4736 (range clearance before this explosion) *with* ECF-50-16, USN-10688

Government's 30(b)(6) representative on range clearance also confirmed this.[51] And the Government broke with policy by failing to clear the safe area, the range road, or its surroundings.[52]

This failure mattered. Mr. Fabozzi testified he picked up the object just 20–25 feet from the road next to the OCB.[53,54] If the Government had cleared the area as required, the explosive wouldn't have been there for Mr. Fabozzi to pick up.[55] Simply put, if the Government had followed its own non-discretionary policy, this explosion would never have happened.

---

(range clearance extended to include the safe area); ECF-50-19, USN-11508 (requesting the change); Fed. R. Evid. 407 (feasibility exception).

[51] ECF-50-34, Chioma Dep. 98:19–99:6, 115:14–19, 100:25–101:6.

[52] *Id.* at 115:20–116:22.

[53] ECF-50-38, Fabozzi Dep. 96:12–97:8 ("Wouldn't have been over 20 feet"), 72:13–73:3 ("It was right there next to my ambulance. It couldn't have been 25 feet in the — off the road right there."), 98:12–99:9; ECF-50-38, Fabozzi Dep. Exh. 6 (blue circle represents approximately where he found the object).

[54] He stayed close enough to the ambulance so he could respond to anything that happened in the pit. ECF-50-38, Fabozzi Dep. 108:15–19; ECF-50-8, USN-4289:27–4290:5 (Basilio statement).

[55] ECF-38-1, at 12.

2.1.   **Parties dispute the reason for the safe area.**

The parties clash over another fact question: why the safe area exists. For background, the safe area sits about a mile from the pit, where the demolitions take place.[56] Mr. Fabozzi was in the safe area when the events of this lawsuit occurred.[57] Mr. Basilio testified that the terms "safe area" or "safe zone" were "more or less used by everyone."[58] He said it was Government employees who told him it was a safe area.[59] The OSHA report also notes that the OCB area was a "safe zone."[60] And the term is found throughout the regulations and incident reports.[61]

The Government leans on a new, unsourced definition of "safe area" and argues that no one from the Navy told Mr. Fabozzi, "the safe area is clear of UXOs." But that's the point—no one told him

---

[56] ECF-50-9, USN-4318. Conversely, the Navy has danger zones. ECF-50-34, Chioma Dep. 73:20–23, 110:10–12, 162:6–19.

[57] *E.g.*, ECF-50-38, Fabozzi Dep. at 98:12–99:9, 96:12–97:8 ("Wouldn't have been over 20 feet"), 93:9–15 ("it was no big deal … because it's supposed to have been a safe zone."); ECF-50-9, USN-4318; ECF-50-34, Chioma Dep. 92:1–93:18, 94:4–13, 95:2–7; Chioma Dep. Exh. 3 (area map).

[58] ECF-50-33, Basilio Dep. 70:4–8.

[59] *Id.* at 70:19–22.

[60] ECF-50-9, USN-4318.

[61] *E.g.*, ECF-50-17, USN-10810 ("Range Safety Checklist"); ECF-50-15, USN-7465–66.

what "safe area" really means.[62] Both Mr. Basilio and Mr. Fabozzi understood the meaning of safe area in the context of the conversations they had with Navy employees.[63] Unsurprisingly, civilians will think an area is safe if they are repeatedly told they are in a safe area.[64]

## 2.2. The Government disputes the meaning of the word "all."

The Government says "all" doesn't mean "all," when clearance regulations require the removal and disposal of "all ordnance."[65] The Government takes a phrase from the end of the regulation, "other range debris reasonably possible to detect (normally down to 4 inches in size)," and argues that if an explosive ordnance is smaller than 4 inches, it can ignore the explosive. That's incorrect.

---

[62] *E.g.*, ECF-50-38, Fabozzi Dep. 178:2–8.

[63] *Id.* at 177:7–17; ECF-50-36, Mattes Dep. 50:14–22 (term used while working on the range); ECF-50-33, Basilio Dep. 68:11–69:25 (initial training referred to safe areas in the context of UXOs).

[64] *E.g.*, ECF-50-38, Fabozzi Dep. 48:1–49:14 (noting that he believed the safe zone was cleared of explosives based on conversations with the Navy), 50:2–20, 51:16–24, 177:7–21, 93:9–15 ("it's supposed to have been a safe zone.").

[65] ECF-50-14, USN-6536 ¶ 5.2; *see also* ECF-50-26, USN-16112, USN-16113–14 ¶¶ (4)(d) & (4)(d)(1) (same Navy Policy establishing it as a "minimum requirement").

This argument runs contrary to grammar rules, the EOD experts' conclusions, and common sense.

First, "reasonably possible to detect…" modifies the last clause of the sentence. Under the last-antecedent rule, qualifying phrases apply to the words right before them, not to those farther away.[66] If the modifier were meant to apply to everything in the list, the sentence would be written differently. It would say, "the removal or disposal of all ordnance, inert ordnance debris, training projectile ammunition, and other range debris, all reasonably possible to detect (normally down to 4 inches in size)."

Second, Maj. Lawson, an EOD and explosives safety expert, reached the same conclusion from his field experience.[67] The

---

[66] *Quindlen v. Prudential Ins. Co. of Am.*, 482 F.2d 876, 878 (5th Cir. 1973); *McCullagh v. Dean Witter Reynolds, Inc.*, 177 F.3d 1307, 1309 n.5 (11th Cir. 1999); *Resol. Trust Corp. v. M. & L. Investments*, 984 F.2d 190, 194 (7th Cir. 1993); *Goldberg v. Companion Life Ins. Co.*, 910 F.Supp. 2d 1350, 1353 (M.D.Fla. 2012). Because the former Fifth Circuit decided *Quindlen* before October 1, 1981, it's binding precedent in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209–10 (11th Cir. 1981) (en banc).

[67] ECF-38-1, at 12 ("the object causing injury to Mr. Fabozzi was an ordnance fuse and should have been cleared under this policy"); *see also* ECF-50-34, Chioma Dep. 98:24–100:1, 100:25–101:6 (mentioning no size qualification).

Government designated no rebuttal expert to challenge his findings.

Third, it's clear why you'd remove every piece of explosive ordnance. For other debris, effort isn't the same, because danger isn't the same. Consider this: a piece of ordnance, holding just 1.5 grams of explosive, caused Wayne Fabozzi to lose his left arm, several fingers in his other hand, endure seven surgeries, and suffer a traumatic brain injury.[68] There are strong reasons for the regulations to insist on clearing all explosive material, while not requiring the removal of non-explosive debris smaller than four inches. In any event, the Government's dispute over the meaning of "all" is a simple fact issue, best settled in trial.

### 2.3.  The Government argues an explosive on the surface is actually "subsurface."

Finally, the Government hints strongly, if not says outright, that what Mr. Fabozzi picked up was a "subsurface" UXO. However, federal regulations define "surface clearance."[69] A surface UXO is one you can see or detect with a hand-held

---

[68]  ECF-51-2, USN-3335 (booster contents); ECF-50-37, Snider Dep. 81:19–82:1 (booster coupler detonated).

[69]  ECF-50-13, USN-5909.

magnetometer.[70] Here, Wayne didn't need a magnetometer—he saw it lying on the ground.[71] So, the Government should clear these surface UXOs.[72] Moreover, Maj. Lawson, the Plaintiffs' explosives expert, provided unrebutted testimony confirming the same, adding yet another issue to be decided at trial.[73]

In summary, these rules on what and where to clear are mandatory.[74] If they had been followed, Mr. Fabozzi's injury could have been prevented.[75] At the very least, whether the Government followed these rules is a question of fact, not one for summary judgment.

---

[70] *Id.*

[71] *E.g.*, ECF-50-38, Fabozzi Dep. 95:16–20.

[72] ECF-50-14, USN-6538 ¶ 5.3; cf. ¶ 5.3.1.2 (not required to perform subsurface UXO removal).

[73] *See* ECF-38-1, at 11–12.

[74] ECF-50-14, USN-6485 ("Compliance with this publication is mandatory.").

[75] ECF-38-1, at 12.

3. ***The Government's lack of safety briefs reinforced its negligent conduct.***

Navy instructions make it clear: daily safety briefs "will be given" to all personnel.[76] Don't take the policy's word for it. NOSSA, the agency that owns the policy, confirmed that "the medic should have attended" the brief.[77] So did Commander Beall.[78]

These safety briefings weren't optional—they were mandatory every year and before each operation.[79] The rules are clear on who delivers them and what they cover.[80] Although the Government's account of the UXO briefing and the actual evidence don't match.

---

[76] ECF-50-5, USN-3352 ¶ 10(c); ECF-50-30, NTL-2873 ("The Hazard Control Brief must be up to date and a permanent part of the SOP"); ECF-50-27, USN-17662 ¶ 2(a), 2(a)(1) ("Requirements for a HCB").

[77] ECF-50-29, USN-17806–09.

[78] ECF-50-20, USN-13797–98 ("the exclusion of the contracted medical team [is] inconsistent with High Risk Training evolutions and best practices.").

[79] ECF-50-14, USN-6531 ¶ 4.17.4.4 ("Safety Briefing Requirements."), USN-6485 (noting that this is a mandatory policy).

[80] ECF-51-1, USN-1642–43 (Officer in charge should "Ensure all life-fire participants receive a safety briefing before firing"), USN-1550 (making compliance with the policy mandatory and applicable to all personnel, including contractors); ECF-50-27, USN-17662–63 ¶ 3(a) (minimum contents); *see also* ECF-38-1, at 7–8 (detailing other mandatory policies applicable).

Plaintiffs questioned the Government's 30(b)(6) witness on the briefing given to Mr. Fabozzi (Topic 1).[81] He was asked to compare it with the one all counsel received during the site inspection performed in this case. Here's what they had in common:

- It was only a few minutes.[82]

- It's given outside.[83]

- There were no booklets or documents—it was just a verbal briefing.[84]

- The only document was the sign in sheet.[85]

The representative testified that this briefing mirrored the type given to medics.[86] This testimony contradicts the sworn declaration made for their motion.[87]

---

[81] ECF-50-37, Snider Dep. 39:12–25.

[82] *Id.* at 53:19–20.

[83] *Id.* at 62:18–23.

[84] *Id.* at 53:21–25

[85] *Id.* at 54:1–4.

[86] *Id.* at 54:5–16.

[87] *Compare e.g.*, ECF-38-9, at 2 ¶ 5.

Wayne Fabozzi wasn't briefed per policy, and it mattered.[88]
The last time Mr. Fabozzi got a safety briefing was March 27th,
2018.[89] What happened in those 3.5 years between March 2018
and September 2021? In that time, instructors and U.S. employees
began handing range materials to Mr. Fabozzi to make plaques.[90]

Effectively, Navy employees *showed* Wayne the old safety
briefings didn't matter. Maj. Lawson explained that daily briefings
reinforce safety and prevent picking up dangerous items. He also
pointed out that these briefings work alongside rules that stop
Navy employees from turning explosives into art. If the Navy
hadn't made a habit of using Wayne to create art from range
materials, he would never have picked up that object on
September 10th.[91]

---

[88] ECF-50-36, Mattes Dep. 57:23–58:3; ECF-50-37, Snider Dep. 26:21–
25, 67:5–11; *id.* at 39:12–25 (Topic 1 as the hazard control brief
only).

[89] ECF-50-37, Snider Dep. 64:7–15, 66:16–21 (Government
representative on hazard safety briefings); ECF-50-34, Chioma Dep.
112:11–15 (same).

[90] ECF-50-38, Fabozzi Dep. 172:2–11 (3–3.5 years is when instructors
started); ECF-50-7, USN-4285 (OSHA statement describing the
same), ECF-50-8, USN-4290 (OSHA statement from Basilio
corroborating).

[91] ECF-38-1, at 8.

4.  ***A Navy instructor knew he had an explosive yet gave it to a civilian.***

The Navy instructor knew, or should have known, the object he had in his hands was an explosive. It was careless to hand it to an untrained civilian.

What should an instructor do when encountering a potential explosive? Stop and evacuate people. Even without regulations, industry standards require you to stop and evacuate.[92] But the Navy had rules. It had mandatory rules: step-by-step actions, safety measures, and reporting requirements when a UXO is found.[93] The Government 30(b)(6) representative testified that these procedures are mandatory.[94] The policy includes a flow chart

---

[92] ECF-38-1, at 6–7; *see also Andrulonis v. United States*, 952 F.2d 652, 655 (2d Cir. 1991) (negligent to "keep silent about obvious, easily-correctable dangers" even without "regulatory framework or defined policy."); *Az. Maint. Co. v. United States*, 864 F.2d 1497, 1504 (9th Cir. 1989) (failing to meet industry standard renders Gov't liable).

[93] ECF-50-6, USN-3526 ¶ 5, USN-3528.

[94] ECF-50-37, Snider Dep. 102:18–103:6 (mandatory policy), 99:9–20 (discussing Exh. 5); Snider Dep. Exh. 5; 40:4–8 (Identifying himself as a Gov't representative); *see also* ECF-50-11, USN-4754 ¶ 1 ("All provisions of these SOPs … shall be strictly adhered to and enforced.").

detailing what **must** be done if a potential explosive is suspected.[95]

This includes calling a training timeout—any student or instructor can do this.[96] Then, notify a supervisor and evacuate everyone from the area.[97] Specifically, the Government's representative on UXO response testified that they could evacuate



Figure 1: USN-3529

into the bunker.[98] Instead of following these steps, Mattes handled

---

[95]   ECF-50-11, USN-4764 ¶ (g)(1)–(2) (referencing enclosure 1: USN-3529).

[96]   ECF-50-6, USN-3529; ECF-50-37, Snider Dep. 100:5–13, 101:20–23; ECF-50-39, Wimmer Dep. 92:23–93:1; see also ECF-50-11, USN-4766–67 ¶ (w)(1) (same).

[97]   ECF-50-6, USN-3529; ECF-50-37, Snider Dep. 102:2–17, 105:9–25.; ECF-50-39, Wimmer Dep. 92:2–4, 92:5–7.

[98]   ECF-50-37, Snider Dep. 109:14–110:2, 108:14–23.

the object, looked for nomenclature, confirmed it was an explosive, and **handed it back to Mr. Fabozzi**.[99]

Responding to this mandatory policy, the Government argues they couldn't stop and evacuate because they had an untamped explosive ready to go off. The Government claims Mattes had to choose between two conflicting policies, but both could have been followed **in the same way**. Under the "competing" policy, the Government insists that, "staff, students, and the medics needed to ensure they were protected from the explosions by the OCB."[100] Oddly, just a few pages later, they criticize Maj. Lawson for suggesting Mattes do exactly that.[101] The OCB was right there—

---

[99] ECF-50-36, Mattes Dep. 75:1–17, 77:7–21. Parties dispute whether Plaintiff knew he had a UXO. Mr. Mattes, the instructor who received the object from Mr. Fabozzi, testified they both knew it was an explosive. *Id.* at 75:1–17. He said he could see it in Fabozzi's demeanor. *Id.* at 78:9–12. But Wayne has always said that neither of them knew what the object was. *E.g.*, ECF-50-38, Fabozzi Dep. 58:4–22, 111:24–112:17 (same); ECF-50-7, USN-4285:5–8 (corroborating contemporaneous statement Sep. 28, 2021); ECF-50-33, Basilio Dep. 53:7–10, 76:8–10 (corroborating testimony from co-worker); ECF-50-23, USN-15999 (corroborating statement from government employee from Sep. 13, 2021); Mr. Fabozzi's prior statements are admissible to corroborate his testimony. Fed. R. Evid. 801(d)(1)(B)(i).

[100] ECF-41, at 65.

[101] *Id.* at 66.

within inches—yet Mattes didn't move anyone into it.[102] If he had, no one would have been injured.[103] Instead, he handed a live bomb to a civilian.[104] This not only raises a fact issue about Mattes violating a non-discretionary policy but also emphasizes another breach the Government overlooks. No safety policy allows a range instructor to hand a live UXO to a civilian and tell them to place it wherever they want.

Moreover, the Court will need to decide if this disaster was of the Government's own making. The Beall report finds that the Navy had far exceeded the net explosive weight and tamping requirements, which significantly extended the blast radius beyond the range limits.[105] In fact, the Government's new definition of safe area assumes it's following these mandatory regulations. It's based on predictions about range activities,

---

[102] ECF-50-36, Mattes Dep. 86:8–22.

[103] ECF-50-39, Wimmer Dep. 95:18–96:15 (Gov't rep. testifying that bunker would have protected).

[104] The Government argues there's no state law requiring Mattes to "risk his life" and "rescue" Mr. Fabozzi. Mattes had the UXO in his hands. He handled it, checked the nomenclature, and even said he didn't need to do all that to know it was an explosive. ECF-50-36, Mattes Dep. 80:7–81:13. Then, he handed it to Wayne. This wasn't a mistake of omission—it was a mistake of commission.

[105] ECF-50-20, USN-13795 ¶ 2(b)–2(c); ECF-50-34, Chioma Dep. 158:9–24.

considering factors like explosive weight and whether they're

tamped.[106] That is, the "prediction can go wrong if you're

exceeding the net explosive weight or not following regulations."[107]

If they had followed the rules, Mattes wouldn't be caught with

three untamped explosives, far exceeding the net explosive weight,

going off within range of the safe area where they stood.

Finally, after the explosion, an updated instruction requiring

a training timeout was issued, with no exception to account for the

"competing" policies scenario.[108] If the mandatory policies were

unworkable, you'd expect them to be revised to fit this situation.[109]

In conclusion, Plaintiffs offer expert and factual evidence

tying their injuries to wrongful conduct. Only the Government

wants to try this case on paper alone.[110] They even seek to decide

---

[106] ECF-50-34, Chioma Dep. 74:3–13, 74:15–23, 76:13–19, 161:12–15.

[107] *Id.* at 77:17–24.

[108] ECF-50-24, USN-16023-16024; ECF-38-1, at 6 (Maj. Lawson
Report).

[109] Fed. R. Evid. 407 (remedial measures admissible when feasibility is
in doubt).

[110] The Government leans on a Statement of Facts, many of which
Plaintiffs dispute. Plaintiffs highlight a couple but ask this Court for
a trial to bring out all the facts. For example, Defendant alleges
several facts without citation. *E.g.*, ECF-41, at 45–46 (concerning
the effort and cost necessary for certain activities). And "Prior to

the apportionment of liability as a matter of law—without citing a single Florida case.[111] The Court should decline these invitations.

## DISCRETIONARY FUNCTION

The Government asserts that the discretionary function exception shields them from liability. It does not. To win, the Government had to prove two things.[112] First, the negligent act

---

2021," the Government contends, Mr. Fabozzi received briefings because of having a hunting permit. *E.g.*, ECF-41, at 21 ¶ 59. Their records show the last time he got a license was in 2013, for a fishing license. *E.g.*, ECF-50-18, USN-10821 (showing the last license—for fishing, not hunting—was 2013), USN-10824 (lifetime license issued in 2022). And undisputedly, he had no training between 2018 and 2021. ECF-50-37, Snider Dep. 64:7–15, 66:16–21 (Government representative on hazard safety briefings); ECF-50-34, Chioma Dep. 112:11–15 (same). In that same time, the Navy starts supplying him with material for its plaques.

[111] *Contra Pearce v. Deschesne*, 932 So.2d 640, 641 (Fla. 4th DCA 2006) (reversing summary judgment on apportionment against drunk plaintiff in premises action: "it is the trier of fact that must do the apportioning, not the judge deciding a legal issue."); *United States v. Babbs*, 483 F.2d 308, 309–10 (9th Cir. 1973) (employee injured by explosion not contributorily negligent because of the Army's superior knowledge, failure to warn, and inaction).

[112] *See Autery v. United States*, 992 F.2d 1523, 1526–27 (11th Cir. 1993).

must have been "a matter of choice for the acting employee."[113]
Second, even if there was discretion, the conduct must be the
"kind the discretionary function exception was designed to shield"
by Congress.[114] That is, the Court should not second-guess conduct
"grounded in social, economic, and political policy."[115]

But here, there was no choice or policymaking in how the
Government ran its facilities. The exception does not apply.

## 1.   *Mandatory Obligation*

First, there must be no mandatory obligation. Those can arise
in many ways. For example, federal statutes, regulations, or
policies create them.[116] And contracts can bind the Navy to a

---

[113] *Berkovitz v. United States*, 486 U.S. 531, 536 (1988); *Phillips v. United States*, 956 F.2d 1071, 1074 (11th Cir. 1992) (same).

[114] *Berkovitz*, 486 U.S. at 536.

[115] *Id.*

[116] *Berkovitz*, 486 U.S. at 536; *see also Phillips*, 956 F.2d at 1076 (safety manuals).

mandatory duty.[117] Industry standards can too.[118] Even the "unwritten policy and practice of employees" can create mandatory duties.[119]

Although, when the Government makes a policy decision, it must carry it out with due care.[120] Take *Phillips*: the Government claimed discretion in the design and implementation of a safety program for a construction project.[121] The court disagreed, holding that once the Government makes a decision, it can take on "substantial, mandatory responsibilities" in executing that decision and can be negligent in fulfilling those safety duties.[122]

---

[117] *Andrews v. United States*, 121 F.3d 1430, 1439 & n.5 (11th Cir. 1997) (adopting the district courts' reasoning that "contracts between the Navy and Waste Control" imposed a mandatory duty on the Navy); *see also Bell v. United States*, 127 F.3d 1226, 1229 (10th Cir. 1997) (collecting cases).

[118] *Az. Maint. Co. v. United States*, 864 F.2d 1497, 1504 (9th Cir. 1989) (failing to meet industry standard renders Gov't liable).

[119] *Perkins v. United States*, 339 F.Supp.3d 1309, 1313–14 (S.D.Fla. 2018).

[120] *See e.g.*, *Caplan v. United States*, 877 F.2d 1314, 1316 (6th Cir. 1989); *Bagner v. United States*, 428 F.Supp.2d 101, 108–109 (N.D.N.Y. 2006) (even if regulations allow some discretion in placing warning signs, when specific orders exist to post them, the discretionary function exception doesn't apply).

[121] *Phillips*, 956 F.2d at 1075.

[122] *Id.* at 1076.

The Government's arguments here mirror theirs in *Phillips*. Even if there's policy discretion at a high level, *Phillips* shows that breaking mandatory policies in the implementation isn't protected by the exception.

Similarly, in *Caplan*, the United States contracted with the Plaintiff to cut down trees on federal land.[123] The court held that high-level discretionary decisions did not directly or implicitly require the omission of warnings to the Plaintiff.[124] Once the Government exercises discretion, it is accountable for negligence in the implementation, including any liability under state premises law.[125]

In short, every wrongful act or omission the Plaintiffs cite comes from mandatory rules.[126] In the Government's words, the "Explosive safety program is driven by policy and we are either in compliance or not in compliance."[127] A deviation from policy "is

---

[123] 877 F.2d at 1315.

[124] *Id.* at 1316.

[125] *Id.* at 1316–18; *see also Tinker v. United States*, 982 F.2d 1456, 1464 (10th Cir. 1992) (no discretion for failure to warn); *McMichael v. United States*, 751 F.2d 303, 307 (8th Cir. 1985) (51-step checklist gave no discretion).

[126] ECF-38-1, at 4–12.

[127] ECF-50-25, USN-16106.

inconsistent with a training environment and an unacceptable assumption of risk."[128] Here, the Government violated non-discretionary policies on UXO clearance, safety warnings, and handling. Because of that, it can't meet the first requirement of the discretionary function exception.

## 2. *Policy-Making Decision*

Second, the conduct must be "grounded in social, economic, and political policy." It doesn't cover the Government's daily, functional activities. The key question is whether the complaint targets the "nature of the rules which a government agency has formulated," or the way those rules are applied.[129] The exception was meant to protect the legitimacy of regulations, not their application.[130]

In *Mandel*, the Eighth Circuit rejected the discretionary function defense when the Government failed to warn about

---

[128] *Id.*

[129] *Hendry v. United States*, 418 F.2d 774, 782 (2d Cir. 1969) (citing *Dalehite v. United States*, 346 U.S. 15, 27 (1953)).

[130] *Id.*; *see also Stewart v. United States*, 486 F.Supp. 178, 181 (C.D.Ill. 1980) (primary purpose exception "was to preclude testing the legality of a statute or regulation by a tort action.").

submerged rocks in a swimming hole.[131] The court found this wasn't a "policy or planning" decision.[132] Similarly, in *Andrulonis*, a lab tech was infected by rabies after a CDC employee failed to warn about obvious dangers.[133] The Second Circuit ruled that the discretionary function exception didn't protect the decision to "keep silent about obvious, easily-correctable dangers," even without a specific regulation on the matter.[134]

In this case, the Plaintiffs aren't challenging social, economic, or political decisions. They're not complaining of bad policy, just that the Government enforce the rules already in place in its day-to-day operations. For this reason, the discretionary function exception doesn't apply.

## MISREPRESENTATION

Section 2680(h) excludes "Any claim arising out of … libel, slander, misrepresentation, deceit, or interference with contract rights." This exception simply restates the traditional legal

---

[131] 793 F.2d 964, 967–68 (8th Cir. 1986).

[132] *Id.*

[133] 952 F.2d 652, 653 (2d Cir. 1991).

[134] *Id.*

definition of "negligent misrepresentation" as Congress understood it when it enacted the FTCA.[135] The misrepresentation exception doesn't cover many forms of negligent conduct that might involve some element of misrepresentation in the generic sense.[136] Three reasons pull Plaintiffs' lawsuit out of the misrepresentation exception:

- First, Plaintiffs are suing because of the Government's operational negligence.

- Second, Plaintiffs aren't suing for negligent misrepresentation.

- Third, Plaintiffs aren't suing for commercial negligence.

## 1. *Plaintiffs complain of the daily operation of the Government.*

"Where the gravamen of the complaint is the negligent performance of operational tasks, rather than misrepresentation," the misrepresentation exception does not apply.[137]

---

[135] *Block v. Neal*, 460 U.S. 289, 296 & n.5 (1983).

[136] *Id.*

[137] *Ingham v. E. Air Lines, Inc.*, 373 F.2d 227, 238–39 (2d Cir. 1967) (holding "negligent failure of its employees to convey weather information was not a 'misrepresentation'"); *Matthews v. United*

What is operational negligence? Well, failure to warn cases are the bread-and-butter of operational negligence. In *Mandel v. United States*, a man dove into a swimming hole at a national park and hit a hidden rock, leaving him paralyzed.[138] The Government argued that the misrepresentation exception blocked his failure-to-warn case.[139] The Eighth Circuit ruled that the duty didn't arise from misrepresentation but was rooted in the common-law duty to warn.[140] *Mandel* is not alone.[141]

---

*States*, 456 F.2d 395, 398 (5th Cir. 1972) (exception not applicable to negligence of an "operational task") (old Fifth Circuit case, binding on the Eleventh); *Preston v. United States*, 596 F.2d 232, 238 (7th Cir. 1979) (same); *see also Mundy v. United States*, 983 F.2d 950, 952 (9th Cir. 1993) (same).

[138] 793 F.2d 964, 965 (8th Cir. 1986).

[139] *Id.*

[140] *Id.* at 967–68.

[141] *E.g.*, *Abbott v. United States*, 78 F.4th 887, 903 (6th Cir. 2023) ("Plaintiffs' failure-to-warn claim sounds in negligence, and not in misrepresentation"); *Trentadue v. United States*, 397 F.3d 840, 854–55 (10th Cir. 2005) (failure to warn of the battered condition of prisoner's dead body not barred); *Ramirez v. United States*, 567 F.2d 854, 586–57 (9th Cir. 1977) (failure to warn of risks of surgery); *Zelaya v. United States*, 781 F.3d 1315, 1337–38 (11th Cir. 2015) (distinguishing cases because they were failure to warn cases); *Murrey v. United States*, 73 F.3d 1448, 1450–51 (7th Cir. 1996) (failure to warn case: misrepresentation exception excludes negligence "injuring merely the pocketbook" and "does not exclude claims of physical injury that happen to involve, as many do, an

Other examples of errors in the daily operation of Government include:

- When the defendant has "operational control" of the premises.[142]

- The failure to operate the criminal history background check system causing a mass shooting.[143]

- Medical malpractice in the failure to disclose pertinent information.[144]

- Misfiling a report, resulting in an error in processing a security clearance.[145]

---

element of communication or misleading silence."); *In re Flint Water Cases*, 482 F.Supp.3d 601, 639–39 (E.D.Mich. 2020) (failure to warn of lead in water); *Burgess v. United States*, 375 F.Supp.3d 796, 817 (E.D.Mich.2019) (same); *McNeil v. United States*, 897 F.Supp.309, 312 (E.D.Tex. 1995) (failure to warn of defective smoke detector); *Wenninger v. United States*, 234 F. Supp. 499, 505 (D.Del. 1964) (failure to warn aircraft causing crash).

[142] *Gen. Pub. Utilities Corp. v. United States*, 551 F.Supp. 521, 528 (E.D.Penn. 1982).

[143] *Holcombe v. United States*, 388 F.Supp.3d 777, 793–95 (W.D. Tex. 2019); *Woods v. United States*, 677 F.Supp.3d 1112, 1120–22 (S.D. Cal. 2023) (almost the same factual scenario and legal result as *Holcombe*).

[144] *Hicks v. United States*, 511 F.2d 407, 413–14 (D.C. Cir. 1975); *James v. United States*, 483 F.Supp.581, 585 (ND Cal 1980 (similar).

[145] *Mundy v. United States*, 983 F.2d 950 (9th Cir. 1993).

The core of Plaintiffs' lawsuit is operational negligence, not a false statement.[146] Any communication involved is secondary to the operations at fault. In plain terms, Plaintiffs point to the everyday conduct that led to their harm.

## 2.   *Plaintiffs don't allege a misrepresentation cause of action.*

Further, Plaintiffs are not making a misrepresentation claim—neither in form nor in substance. In *Block v. Neal*, the Supreme Court drew a line between claims covered by the misrepresentation exception and those rooted in other duties, even if they involve some communication.[147] *Block* dealt with a negligent undertaking where the plaintiff blamed the Government's poor inspection for defects in her home.[148] The Court held that the misrepresentation exception does not apply to negligence claims focused on a breach of some other duty.[149] The Court noted that in negligent undertaking cases, the Government's statements aren't essential to the negligence

---

[146] *See Holcombe*, 388 F.Supp.3d at 795 (not a misrepresentation because it accurately conveyed the information the Government had).

[147] 460 U.S. 289, 290, 293 (1983).

[148] *Id.*

[149] *Id.* at 297.

claim.[150] Even if there's some overlap in the proof needed for negligent undertaking and misrepresentation, it doesn't mean that if one is barred, the other must be as well.[151]

Closer to home is *Brown v. United States*. There, an employee of a contractor was hurt in an explosion after the Government negligently gave the contractor a bomb.[152] The plaintiff sued the Government for failing to deactivate the bomb and for not warning about the danger. The Court refused to let the Government turn a clear negligence case into a misrepresentation case.[153] In doing so, it distinguished the Government's cases because they involved losses of profit or money, not physical injuries, and the goods in those cases weren't inherently dangerous.[154]

Here, the Government's negligence comes from its duty to maintain safe premises and to use reasonable care, both in its work and when dealing with dangerous things. These duties don't fall under the misrepresentation exception.

---

[150] *Id.*

[151] *Id.* at 298.

[152] 193 F.Supp. 692, 692 (N.D.Fla. 1961).

[153] *Id.* at 692–93.

[154] *Id.* at 692.

### 3.  *Plaintiffs don't complain of commercial decisions.*

At common law, the Restatement described liability for negligent misrepresentation applying when it was tied to commercial or financial matters, not personal safety.[155] For the misrepresentation exception to apply, the lawsuit must be about economic decisions, based on information one could reasonably rely on in their financial dealings.[156]

---

[155] Restatement (Second) of Torts § 552 (Negligent Misrepresentation); *United States v. Neustadt*, 366 U.S. 696, 706–07 & n.16 (1961) (*citing* § 552); Block, 460 U.S. at 297 & n.6 (*also citing* § 552).

[156] *Neustadt*, 366 U.S. at 706; *see also Block*, 460 U.S. at 297 ("Section 2680(h) thus relieves the Government of tort liability for pecuniary injuries…"); *Matthews v. United States*, 456 F.2d 395, 397–98 (5th Cir. 1972) (tort confined to "invasion of interests of a financial or commercial character, in the course of business dealings.") (quoting *Neustadt*); *Krejci v. United States*, 733 F.2d 1278, 1281 (7th Cir. 1984); *Zelaya v. United States*, 781 F.3d 1315, 1336 (11th Cir. 2015) (Gov't "is not liable, however, for injuries resulting from commercial decisions made in reliance on government misrepresentations.") (internal quotation omitted); *Kohn v. United States*, 680 F.2d 922, 926 (2d Cir. 1982) (exception generally "applied only to actions for damages due to commercial decisions."); *Green v. United States*, 629 F.2d 581, 585 (9th Cir. 1980) (the test is "whether it resulted from a commercial decision based on a government misrepresentation"); *Allen v. United States*, 527 F.Supp. 476, 492 (D. Utah 1981) (same). Other courts have relied on the same logic. *E.g.*, *Keir v. United States*, 853 F.2d 398, 410–11 (6th Cir. 1988) (medical malpractice in doctor falsely representing themselves to be an ophthalmologist was not barred because misrepresentation usually confined to invasion of

When you look at the Eleventh Circuit's rulings on this issue, again and again, they're about commercial financial dealings.[157] Plaintiffs' case doesn't belong.

---

interests of a financial or commercial character and is collateral to medical negligence); *Salter v. United States*, 853 F.Supp.389, 394 (M.D.Ala. 1994) ("Since Plaintiff's claim in this case is for personal injury, not for injury of a commercial or financial nature, the Court finds that his negligence claim is not covered by the misrepresentation exception.").

[157] *E.g.*, *Omnipol A.S. v. Multinational Def. Servs., LLC*, 32 F.4th 1298, 1306–07 (11th Cir. 2022) (claims for fraud, civil theft, & unjust enrichment arising out of the sale, manufacture, and delivery of assault rifles); *Alvarez v. United States*, 862 F.3d 1297, 1300 (11th Cir. 2017) (suit arising out of an investment Ponzi scheme); *Zelaya v. United States*, 781 F.3d 1315, 1333 (11th Cir. 2015) (suit based on SEC violation of law requiring it to notify SIPC of a company's financial issues); *JBP Acquisitions, LP v. United States*, 224 F.3d 1260, 1262-63 (11th Cir. 2000) (suit arising out of the purchase of low-income housing); *Evergreen Marine, Ltd. v. United States*, 789 Fed. App'x. 798, 799 (11th Cir. 2019) (suit based on Coast Guard's representation that the vessel was unencumbered by a mortgage); *Daugherty v. Fed. Trade Comm'n.*, Nos. 23-11428, 23-11431, 2023 WL 6389821 (11th Cir. 2023) (suit allegedly forcing the closure of the business with a fraudulent civil enforcement); *Goble v. Ward*, 628 Fed. App'x. 692, 689–99 (11th Cir. 2015) (suit alleging wrongful SEC civil enforcement); *Island City Lofts LLC v. United States*, 426 Fed. App'x. 777, 777–78 (11th Cir. 2011) (arising from USPS employee forging a signature, resulting in lost profits).

# CAUSES OF ACTION

The Government offers no new arguments on negligent undertaking. So, Plaintiffs will address the points made on other causes of action.

## 1. *Ultrahazardous Activities*

Plaintiffs, citing *Stevens v. United States*, claim ultra-hazardous negligence.[158] The Court noted that the standard of care depends on the circumstances of the case.[159] Here, DoD policy demands "maximum possible protection" for people and property from military munitions.[160] Navy instructions echo this, stating a duty to protect both public and military personnel "to the maximum extent practical."[161]

The Government argues this theory duplicates Plaintiffs' negligence claim. Although in *Stevens*, plaintiffs brought both negligence and ultra-hazardous activities.[162] Under Florida law,

---

[158] 994 So. 2d 1062, 1064, 1069–70 (Fla. 2008).

[159] ECF-18, at 3 & n.1.

[160] ECF-50-21, USN-14713 ¶ 4.a.

[161] ECF-50-26, USN-16113 ¶ 2(c).

[162] *Stevens v. United States*, No. 9:03-cv-81110 (S.D.Fla. Dec 2, 2003) (ECF-1).

the Fabozzis can hold the Government to a higher standard in these circumstances. That right isn't redundant.

## 2. *Premises Liability*

The Government claims Mr. Fabozzi lost his status as a business invitee, and even if not, they argue they met the standard. On the second argument, they repeat old arguments.

On the first argument, Mr. Fabozzi didn't lose his status. In *Osorio v. United States*, the court refused to grant summary judgment when a plaintiff went beyond her invitation at a Post Office, ruling the United States should have "reasonably anticipated" people to be in that area.[163] There were no signs to keep people out, just like here.[164] The court also noted these questions are for a trial to decide.[165]

---

[163] No. 08-cv-80459, 2010 WL 11504741, at *9–10 (S.D.Fla. 2010) (citing cases). This rule extends the invitation to all places "**convenient for the invitee to visit** or use in the course of the business for which the invitation was extended." *IRE Fla. Income Ptrs. Ltd. v. Scott*, 381 So.2d 1114, 1117 (Fla. 1st DCA 1979) (emphasis added).

[164] *Id.*

[165] *Id.*

On the question of reasonable anticipation, at the very least, the facts are in dispute. The Government knew Plaintiff went on the range and picked up items—often instructors handed them to him. One witness admitted it was "well known."[166] Moreover, Mr. Fabozzi picked up the object on the south side of Range Road 200.[167] Photos from there show footprints and tire tracks in the grass.[168]



Figure 2: NTL-3786 (south facing)

---

[166] ECF-50-36, Mattes Dep. 48:3–18; pp. 9–12, *supra.*

[167] ECF-50-38, Fabozzi Dep. 92:17–22.

[168] *E.g.,* ECF-50-31, NTL-3785, NTL-3786, NTL-3664, NTL-3784; ECF-50-39, Wimmer Dep. 112:5–23, 113:24–114:3.

The Government says no one should walk on the grass, yet they put the bathroom and other buildings there.[169]



Figure 3: NTL-3672 (north facing)

And the only signs found during the Plaintiffs' site inspection were on the north side of the road—in disrepair, lying hidden in the grass.[170]

At the very least, it's a question of fact whether the Government should have expected people in the area. Mr. Fabozzi

---

[169] ECF-50-31, NTL-3672.

[170] ECF-50-31, NTL-3660, NTL-3803, NTL-3806; ECF-50-39, Wimmer Dep. 124:15–20, 123:13–21, 125:3–8 (Gov't 30(b)(6) Rep.).

was in a place where he was "well known" to be, and they owed him the duty to keep it reasonably safe.



Figure 4: NTL-3660, NTL-3803, NTL-3806. (north facing)

## CONCLUSION

The Court should deny the Government's motion. The mandatory rules in the operation of their facility bring this case outside the FTCA's exceptions. The remaining issues of negligence and contributory negligence are classic fact questions for trial.


Respectfully Submitted,


/s/ Tom Jacob
TOM JACOB


Page 44 of 46

tjacob@nationaltriallaw.com
Texas State Bar #24069981
JAMAL ALSAFAR
jalsaffar@nationaltriallaw.com
Texas State Bar #24027193
WHITEHURST, HARKNESS,
BREES, CHENG, ALSAFFAR,
HIGGINBOTHAM, & JACOB
P.L.L.C.
1114 Lost Creek Blvd, Ste. 410
Austin, TX 78746
(512) 476-4346 (o)
(512) 467-4400 (f)


B. SHANNON SAUNDERS
ssaunders@saunderslawfirm.com
Florida State Bar #178233
Camerin J. Dixon-Hatcher
chatcher@saunderslawfirm.com
Florida State Bar #1025111
B. Shannon Saunders, P.A.
4359 Lafayette Street
P.O. Box 5896
Marianna, Florida 32447
(850) 526-5535 (o)
(850) 526-5586 (f)

Attorneys for the Plaintiffs


## LOCAL RULE 7.1(F) CERTIFICATE

I certify that, per the Microsoft Office word count feature, this pleading is no more than 7,929 words, including headings,

footnotes, and quotations, but excluding the case style, signature block, and this certificate of word count.

/s/ Tom Jacob